## THE STATE v. HOMER O. PORTER, Appellant.

### Division Two, June 16, 1908.

1. **INSANITY: Instruction: General.** A general instruction for the State on the subject of insanity, defining the term, and declaring when insanity will authorize the acquittal of a defendant charged with murder, is set out in paragraph one of the opinion, and held to be correct.

2. ———: ———: **Insane at the Time.** Defendant's father had quarreled with his wife and children and gone to the barn, and as he was returning, defendant, his son, from an upstairs window, shot at him with a shot-gun. His brother took the gun from him, and then defendant got a pistol, ran to the barnyard where his father was behind a crate and shot him four times. The instruction given read: "If the jury believe and find that defendant shot at deceased with a repeating shot-gun, and that said shooting was intentional and not in the necessary defense of defendant, his step-mother, brother, or sister, as herein explained, and immediately thereafter became temporarily insane in consequence of what he had done, then such temporary insanity will not excuse him from responsibility in this case." *Held,* error. It makes no difference what caused the insanity, or at what portion of time he became insane; if at the time the fatal shot was fired he was insane, how his insanity was produced is a matter of no consequence. From a legal standpoint the test is whether at the time of the commission of the criminal act defendant had mental capacity to distinguish between right and wrong with respect to that act.

3. ——: ——: **Necessary Proof.** An instruction for defendant, telling the jury that "to establish insanity as a defense,. positive or direct testimony is not required," covering a subject not covered by any other given, may appropriately be given.

4. **INSTRUCTION: Defendant as a Witness: "If Any."** The words "if any" in the State's instruction concerning defendant's competency as a witness, in the clause, "Yet, the jury in determining the weight to be given the testimony of the defendant, if any, have the right to consider his interest in the result of this prosecution," should be omitted. It is best, in giving an instruction on defendant's competency as a witness, to follow approved precedents.

5. **EVIDENCE: Insanity: Statements Made By Defendant: Res. Gestae: Self-Serving.** Defendant's sanity at the time he committed the act was directly involved, and the court excluded the testimony of three witnesses to the effect that when they reached the premises, shortly after defendant had shot his father, defendant was running around in an excited condition, exclaiming that the deceased "will kill us; he will kill all of us"—meaning his step-mother, brother, sister and himself, all of whom deceased had threatened to kill shortly before the homicide. *Held*, that the testimony was competent as bearing on the defense of insanity, but not as a part of the *res gestae*. These statements are not to be considered self-serving, although they would be if the defense of insanity were not in the case, but they should be limited by a proper instruction to that defense alone.

6. **DEFENSES: Consistent: Insanity and Self-Defense: Instruction.** Insanity and self-defense are not inconsistent defenses, and if there is evidence to support both, an instruction directing the jury that defendant may be acquitted on the one or the other or both should be given. But if there is no evidence of self-defense, such instruction should not be given.

7. **THREATS: By Defendant: Remote: Admissibility.** Testimony of threats made by defendant against deceased are admissible in evidence, however remote. Their remoteness does not affect their competency, but it does affect their weight, that depending on their nature and character, the circumstances under which they were made and their remoteness from the time of the homicide.

8. **HOMICIDE: Manslaughter: Instruction.** The evidence in this case did not warrant an instruction upon manslaughter in the fourth degree.

9. **EVIDENCE: Insanity.** Great latitude is allowed in an investigation of the subject of insanity where it is interposed as a defense in a criminal prosecution. Evidence of anything and everything which in some substantial way would tend to show that defendant's nervous organization was affected should be admitted.

Appeal from Clinton Circuit Court.—*Hon. B. J. Casteel,* Special Judge.

REVERSED AND REMANDED.

*W. S. Herndon* and *E. C. Hall* for appellant.

(1) The court erred in refusing to permit D. M. McWilliams, Luke Grogan and Jesse Albright to testify to statements made by defendant immediately after the tragedy. These statements were part of the *res gestae,* and besides they tended to show the mental condition of defendant at the time of the shooting. Defendant may show his physical and mental condition at the time of the homicide. 6 Ency. Evid., p. 738; Sage v. State, 91 Ind. 141; Elliott on Evidence, sec. 3042. Declarations and statements of defendant made during the continuance of the homicidal act or while its influence controls his mind are competent as part of the *res gestae.* 6 Ency. Evidence, p. 620; Foster v. State, 8 Tex. App. 248; Mildium v. State, 11 Ga. 615; Ingram v. State, 43 S. W. 518; Elliott on Evidence, sec. 3030. (2) The testimony of Mrs. Moore as to statements made by defendant seven or eight years before the killing was too remote. (3) (a) The court failed to give an instruction on manslaughter in the fourth degree. The evidence showed that deceased, just prior to the shooting, was in a violent rage; that he told his wife to go to the devil, that they would both leave and in a way she did not want to; that he said he would kill the whole family before night; that he slammed the door as he went out of the room; that he was seen

immediately after, coming towards the house with a gun, etc.; this, with the absence of any evidence of malice, entitled defendant to this instruction. State v. Darling, 199 Mo. 197; State v. Todd, 194 Mo. 377; State v. Weakley, 178 Mo. 413; State v. McKenzie, 177 Mo. 699; State v. Herman, 117 Mo. 629. (b) The court failed to give an instruction that insanity need not be proved by direct and positive evidence, that it was not necessary to prove it beyond a reasonable doubt, and that a preponderance of the evidence was all that was necessary. State v. Wright, 134 Mo. 404; State v. Bell, 136 Mo. 120. (4) The court improperly took from defendant one of his defenses by giving instruction 9, in which the court informs the jury that if defendant became insane because of his own act, then he was not insane, or, if he was, it would not excuse him. State v. Riley, 100 Mo. 499; State v. Hundley, 46 Mo. 414; Dent v. State (Tex. Crim.), 79 S. W. 525; People v. Downs, 56 Hun 5, 8 N. Y. Supp. 521. (5) Declarations of defendant just after the act should have been admitted upon the question of insanity. 7 Ency. Ev., p. 447; State v. Kring, 64 Mo. 591. Any material fact which might account for or naturally lead to insanity at the moment of the *factum* may be proved. 7 Ency. Ev., p. 449; 6 Ib., p. 606. The conduct of defendant at the time of and after the act in question may be considered upon the question of insanity. 7 Ency. Ev., p. 449; Massengale v. State, 24 Tex. App. 181; Com. v. Pomeroy, 117 Mass. 143. The legal test is whether defendant had mental ability to distinguish between right and wrong with respect to the act committed. State v. Redemeier, 71 Mo. 173; State v. Sheafer, 116 Mo. 96; State v. Wright, 134 Mo. 404; State v. Palmer, 161 Mo. 152; State v. Pagels, 92 Mo. 300. (6) The court erred in refusing instruction "I" offered by defendant. It was a correct proposition of law and was not given or contained in any of the in-

structions given by the court. State v. Wright, 134 Mo. 404; State v. Bell, 136 Mo. 120. (7) The court erred in refusing instruction "H," prayed by defendant. It was correct, was not embodied in any given instruction, and should have been given. State v. Wade, 161 Mo. 444.

*Herbert S. Hadley,* Attorney General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1) As to the testimony of the witness McWilliams, elicited by defendant, on cross-examination, to the effect the defendant said, "He (the deceased) will kill us, he will kill all of us." This witness testified that he lived one-quarter of a mile from the place of the shooting, and that, after the shooting, Charles Porter hurried over to the home of the witness, and the witness went to the scene of the shooting, a quarter of a mile distant. It will readily be seen that what defendant then said was not a part of the *res gestae,* but a self-serving statement and was properly stricken out. And the same may be said of the excluded testimony of the witness Duke Grogan, and the excluded testimony of the witness Jesse Albright. The deceased was shot and killed by defendant before Charles Porter left the house; then Charles went for McWilliams, who was a quarter of a mile away; and McWilliams went to the place where the shooting occurred. Grogan reached that place after McWilliams did. In a case where a physician was called to see the deceased, who had been wounded in a saloon, and reached the saloon ten or fifteen minutes after the shooting, this court held that a statement by the wounded man to the physician was not a part of the *res gestae.* State v. Birks, 199 Mo. 273. And in another case, this court held that a statement made by the deceased, who, after he was mortally wounded, walked to his house, opened the front door, walked in and told his wife that the two defendants

had made good their threats, was not a part of the res gestae. State v. Hendricks, 172 Mo. 673. Self-serving statements of a defendant are not admissible in his behalf, either from his own witness or a witness of the State. In discussing the inadmissibility of self-serving statements, Elliott says: "So the declarations of the defendant, directly after the shooting, as to why he had shot the deceased, have been held not part of the res gestae, and not admissible." Elliott on Evidence, sec. 3030; State v. Talbert, 41 S. C. 526; State v. McCracken, 66 Iowa 569; Collins v. Todd, 17 Mo. 537; Underhill on Crim. Ev., sec. 151; King v. State, 65 Miss. 583. (2)    (a)    The evidence of State's witness, Mrs. Lillie Moore, to the effect that she heard the defendant say that he would just as soon kill the deceased as look at him; and that he (defendant) was ready for any trouble, if it came, was admissible. Especially was it competent, as, at the time of making the last remark, the defendant was talking about his father in an up-stairs room and had a loaded pistol in his hand, and two shot-guns in the room. And the fact that this threat was made in June, 1906, and the first threat six or seven years before, did not render them inadmissible. People v. Cronin, 34 Cal. 205; State v. Ford, 3 Strobhart (S. C.) 517; Redd v. State, 68 Ala. 497; State v. Campbell, 35 S. C. 32; Everett v. State, 62 Ga. 65; Underhill on Crim. Ev., sec. 329; 1 Wigmore on Ev., sec. 108; Goodwin v. State, 96 Ind. 552; State v. Wright, 141 Mo. 337; 1 Bishop's New Crim. Proc., sec. 1110.    (b)    No error was committed in overruling defendant's objection to the testimony of State's witness Bayless, and in refusing to strike out said testimony. Said testimony was to the effect that the witness was working the road with defendant in the fall of 1905, and defendant said if the old man did not do by him as he did by the older children, defendant had a way to get even with him. No objection can be made

to this threat on the grounds of remoteness, and it certainly showed a bitter feeling that defendant had for his father, and defendant's intentions, if that father did not do as defendant thought he ought to do.   (3) The instructions on the subject of insanity were fair and indeed liberal towards defendant; their substance has often been approved.   State v. Klinger, 46 Mo. 230; State v. Church, 199 Mo. 639; State v. Crane, 202 Mo. 85; State v. Duestrow, 137 Mo. 44.   Even conceding that there was evidence tending to prove self-defense, defendant was not entitled to instructions on that subject.   By his plea of insanity, the defendant admitted the commission of the criminal act, but interposed, as a defense thereto, that his mental condition was such that he could not distinguish between right and wrong.   Judge Sherwood, in State v. Pagels, 92 Mo. 309, said that such a defense was in the nature of a plea of confession and avoidance, and that it was wholly immaterial to discuss whether or not dying declarations (or, as in this case, the question of self-defense) were properly received in evidence.   The decision in the Pagels case was quoted approvingly by Judge Burgess, with the concurrence of all of the members of this court.   State v. Welsor, 117 Mo. 579; State v. Stubblefield, 157 Mo. 364.   Instruction 9, which defendant's counsel specially criticise, was proper, by reason of the peculiar and almost marvelous testimony of defendant.   He testified that he remembered distinctly to have seen his father out in the hog lot, remembered the threat that his father had made and remembered then to have grabbed his gun and fired at him out of this up-stairs window, but did not remember anything else.   Having begun a felonious assault on his father and having wounded his father, defendant is certainly in no position to claim that that assault caused him to become insane, and that therefore he

should not be held responsible for the rest of his conduct, which was a completion of the murder that he had so wilfully and deliberately begun. (4) Most of the remaining complaints of defendant's counsel relate to the instructions on the subject of self-defense. But it is insisted by the State that there was no self-defense in this case, and no evidence on that subject worthy of consideration. State v. Fraga, 199 Mo. 127; Kerr on Homicide, sec. 180; Kelley's Crim. Law, sec. 517.

FOX, P. J.—This cause is now pending in this court upon appeal by the defendant from a judgment and sentence of the circuit court of Clinton county, convicting him of murder in the second degree. The name of deceased, the party charged to have been killed, was William N. Porter, and the date of the homicide is alleged to be February 17, 1906, and the weapon used is charged to have been a pistol. The deceased and the defendant bore the relation of father and son.

At the January term of the Clinton County Circuit Court in 1907, the defendant was put upon his trial for the offense of murder charged in the indictment. The testimony developed at the trial is quite voluminous, and we shall by no means undertake to reproduce it in detail. We have read the testimony and considered it very carefully and must be content with a brief statement of what the testimony tended to show, or at least a sufficient tendency of the showing to enable us to intelligently discuss the legal propositions presented by learned counsel representing the State and the appellant.

The evidence on the part of the State tended to show that the defendant was the son of the deceased by his second wife, and at the time of the alleged commission of the homicide was over the age of twenty-one years; he lived with his father, the deceased, who was

a well-to-do farmer, living upon a farm near Platts-
burg, Clinton county, Missouri, which he owned and
had well stocked. Some years before William N. Por-
ter was killed, he married his third wife, who was
about twenty years his junior, and took her to his
home on his farm, where he, his wife, the defendant
and his brother Charles and his two younger sisters
all resided. The testimony also tended to show that
there was an extremely unfriendly feeling existing be-
tween the deceased and his wife and this unfriendly
feeling for several years developed into violent demon-
strations on the part of the deceased to do his wife some
personal harm. This unfriendly feeling, and followed
by demonstrations of violence toward his wife, seemed
to have originated at some of the times about a dis-
agreement about selling the farm, the deceased want-
ing to sell the farm and the wife objecting to selling it.
The wife on one or two occasions declined to sign a
deed that her husband would request her to sign, con-
veying the farm. The children, that is, the defendant
and his brothers and two sisters, all of whom lived
with their father and step-mother, were inclined to
take the side of the step-mother in these disputes. A
time or two the wife declined to sign the deed but fin-
ally signed it under protest, and on the date of the hom-
icide, February 17, 1907, the deceased again approach-
ed his wife and again brought up the difficulty and
renewed the disagreement between them in regard to
the sale of the farm. The testimony on the part of
the State tends to show that all the family ate dinner
at the home of the deceased at twelve o'clock on the
day of the homicide and after dinner deceased threw
the deed in his wife's lap and told her she could burn
it up. His wife declined to take the deed or to have
anything to do with it, and the deceased then threw the
deed in the stove. There was other testimony on the
part of the State tending to show that the deceased

then walked out to the hog lot, carrying a bucket of slop to his pigs and soon started back towards the house. The two sons, Homer and Charles, were upstairs in their bed room. The defendant got his shotgun, which was loaded with bird-shot, and fired out of an upstairs window. After the firing of this shot Charles Porter, his brother, took the gun away from him and the defendant then got his pistol and rushed down the steps, out through the yard and into the hog lot where his father was behind a crate and near a wood pile. After getting within a few feet of his father the defendant fired several shots with his pistol, four of which took effect and resulted in the death of his father. Mrs. Porter, the wife of the deceased, and the two girls rushed out of the house and put their arms around the defendant and tried to get him to go into the house. Charles Porter, his brother, started off after the neighbors. Mr. Winn, Mr. McWilliams and Mr. Grogan, neighbors, arrived shortly after the shooting and found the deceased lying near the wood pile in an apparently lifeless condition. They observed that there was a wound in his hand and several wounds in his leg, which apparently were inflicted by a shot gun. When the neighbors came the defendant was still in the yard with his step-mother and sisters, very much excited and very nervous. The defendant at that time had a pistol and shot gun in his hands. Later on in the day after the shooting, George Ryan, another neighbor, examined the wounds on the deceased's body and found one in the temple, made by a bullet from a pistol, which also showed powder burn. The neighbors persuaded the ladies to go into the house and Mrs. Porter went to bed and defendant also went to bed, and still appeared nervous and a physician gave him some medicine. The State also introduced some evidence tending to show that the defendant had some

time previous to this homicide threatened to kill his father.

On the part of the defendant there was testimony tending to indicate that the defendant was impressed that his step-mother and the other children looked to him for protection against any violence on the part of his father, and there was testimony tending to show that he had prevented on other occasions his father from doing violence to his stepmother. There was also evidence tending to show that there was a very unfriendly feeling existing between deceased and his wife, relative to the sale of their farm; that on several occasions, the quarrel between them was renewed, and that the deceased several times threatened to kill his wife if she did not sign the deed. On the day of the homicide, immediately after dinner, the deceased threatened to kill his wife and all the family, threatened to send them off of the place and send them to another place where they did not want to go. The defendant's evidence also tended to show that the deceased carried his gun with him out of the house and started back from the hog lot carrying his gun. The defendant testified that he became so alarmed because of the threats made by his father, and because of the further fact that his father was carrying a gun and coming toward the house, that he fired out of an upstairs window at his father, but he did not remember anything further that he did. Other witnesses testified that the defendant immediately after the shooting was in an insane condition, and that he did not know what he was doing, nor what any one was saying to him. Dr. Streckman testified that he was called to the Porter home in the afternoon and examined the defendant and found that it was necessary to give him medicine in order to relieve him of the intense excitement with which he was then suffering, and that in his opinion the defendant was temporarily insane. Other witnesses testified to the good

reputation of the defendant in the community in which he lived, and also to the fact that in their opinion the defendant was insane just after the difficulty.

In rebuttal, the State introduced several of the gentlemen who composed the coroner's jury who testified to the conduct and actions of the defendant at the home that afternoon, and that in their judgment he was a sane man at the time.

At the close of the evidence the court instructed the jury upon murder in the first and second degrees, as well as upon the defense of insanity and self-defense, the credibility of witnesses and reasonable doubt. We deem it unnecessary to here reproduce the instructions given by the court, but will give them such attention as we deem necessary during the course of the opinion. The cause being submitted to the jury upon the evidence and instructions of the court they returned a verdict finding the defendant guilty of murder in the second degree, assessing his punishment at twenty-five years in the penitentiary. Timely motions for new trial and in arrest of judgment were filed and by the court taken up and overruled. Judgment was entered in accordance with the verdict and from this judgment the defendant in due time and proper form prosecuted his appeal to this court, and the record is now before us for consideration.

## OPINION.

The record before us in this cause presents numerous complaints of error as grounds for the reversal of this judgment. We shall not undertake to discuss each and every complaint urged by the appellant; to do so would require a volume, hence we shall be content with a discussion of those questions which we deem of most importance as applicable to the case in hand.

I.

It is apparent from the disclosures of the record that there was a double defense interposed to this prosecution, that is, the defense of insanity as well as that of self-defense. Upon the subject of insanity the court instructed the jury as follows:

"In this case, insanity is interposed by defendant's counsel as an excuse for the charge set forth in the indictment. This defense, when established, is one the law recognizes; and should insanity be proved by the evidence in this case to the reasonable satisfaction of the jury, it will be their duty to acquit the defendant altogether.

"Insanity is a physical disease, located in the brain, which disease so perverts and deranges one of the mental or moral faculties as to render the person suffering therefrom incapable of distinguishing right from wrong in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the laws of God and society.

"Therefore, if the jury find and believe from the evidence that, at the time defendant did the killing charged in the indictment, he was so perverted and deranged in one or more of his mental or moral faculties as to be incapable of understanding, at the moment he killed his father, that such killing was wrong, and that defendant at that time was incapable of understanding that the act of killing was a violation of the laws of God and society, they will find him not guilty.

"Insanity is either partial or general. General alienation always excuses. Partial insanity does not always excuse; one may be partially insane and yet be responsible for his criminal acts. The law does not excuse unless the derangement is so great that it actually renders the person incapable, at the time of its commission, of distinguishing between right and

wrong in respect to the particular act charged and proved against him.

"The law presumes every person who has reached the years of discretion to be of sound mind, and this presumption continues until the contrary is shown. So that, as in this case, insanity is pleaded as a defense to a criminal charge, the fact of the existence of such insanity at the time of the commission of the act complained of must, before you can acquit on that ground, be established by the evidence to your reasonable satisfaction; and the burden of proving that fact rests with defendant."

With this declaration upon this subject we are of the opinion there is no fault to be found. Substantially the same instruction has repeatedly met the approval of this court. [State v. Klinger, 46 Mo. l. c. 230; State v. Church, 199 Mo. l. c. 639; State v. Crane, 202 Mo. l. c. 85; State v. Duestrow, 137 Mo. 44.]

## II.

Learned counsel for appellant very earnestly urge that there was error committed by the court in giving instruction numbered 9, which relates to the defense of insanity as interposed by the appellant. It was as follows:

"9. If the jury believe and find from the evidence, that the defendant shot at the deceased with a repeating shotgun, and that said shooting was intentional and not in the necessary defense of the defendant, his stepmother, brother or sister, as herein explained, and immediately thereafter became temporarily insane in consequence of what he had done, then such temporary insanity will not excuse him from responsibility in this case."

We are unable to comprehend upon what theory the trial court based such an instruction. In the briefs of learned counsel, both for appellant and by the

State v. Porter.

learned Attorney-General, we are not cited to any authorities in support of an instruction of that character, nor are we referred to any condemning it, but we take it upon general principles that it makes no difference as to what caused the insanity or at what particular period of time the defendant may have become insane; if at the time the fatal shot was fired or the fatal blow struck he was insane, then it is a matter of absolute indifference as to how that insanity was produced. We might refer to numerous instances in which the wrongful and unlawful acts of a defendant may have been instrumental in leading to his absolute impairment of mind, yet from a legal standpoint the test must be applied as to whether the defendant at the time of the commission of the criminal act had mental ability to distinguish between right and wrong with respect to the act committed. If the defendant was insane at the time of firing the fatal shot which resulted in the death of the deceased, and was unable to distinguish between right and wrong in the commission of the act which resulted in such death, then it can make no difference as to how or in what manner his insane condition was produced. This instruction in our opinion was erroneous, and constitutes such error as warrants the reversal of this judgment.

While upon the subject of instructions upon the defense of insanity it is not out of place to say that instruction "I" requested by the appellant was a very appropriate one and should have been given. That instruction, as requested by the defendant, was as follows:

"To establish insanity as a defense, positive or direct testimony is not required, nor is it necessary to establish this defense beyond a reasonable doubt. It is sufficient if the jury is reasonably satisfied by the weight or preponderance of the testimony that the

accused was, at the time he committed the act, incapable of distinguishing between right and wrong.''

An instruction substantially in the same form was recognized as appropriate in the case of State v. Wright, 134 Mo. l. c. 408. This instruction was requested by the learned counsel for appellant and is not covered by other instructions; therefore, if the testimony upon a retrial of this cause warrants it should be given.

### III.

Complaint is made at instruction number 15, as given by the court. This instruction was as follows:

''You are further instructed that the defendant is a competent witness in this cause in his own behalf and you should consider such testimony in connection with the other evidence given at the trial; yet, the jury in determining the weight to be given to the testimony of the defendant, if any, have the right to consider his interest in the result of this prosecution.''

It is sufficient to say of that instruction that it is much better for the trial courts, in their directions to the jury, to follow the approved precedents. There was no necessity for embracing in this instruction, in calling the attention of the jury to the testimony by the defendant, the terms ''if any.'' In other words, it was not proper to say to the jury ''in determining the weight to be given to the testimony of the defendant; if any,'' that they had the right to consider his interest in this prosecution. The terms employed, ''if any,'' in that instruction should be omitted upon a retrial of this cause. It savors too much of an invitation to the jury not to give any weight whatever to the testimony of the defendant.

## IV.

It is next insisted by learned counsel for appellant that the testimony of witnesses D. M. McWilliams, Luke Grogan and Jesse Albright as to the conduct and actions of the defendant shortly after the homicide was improperly excluded. These witnesses lived some little distance from the premises where the killing of the deceased occurred; however, they reached the premises shortly after the shooting and their testimony was directed to actions and conduct of the defendant after reaching there. The substance of their testimony was to the effect that the defendant was running around in an excited condition, exclaiming that the deceased "will kill us; he will kill all of us." It is insisted that this testimony was admissible upon two theories, first, as a part of the *res gestae,* and secondly, if not a part of the *res gestae,* it was admissible, occurring so shortly after the shooting, as tending to show the mental condition of the defendant at the time of the commission of the homicide. In our opinion, while the question is a very close one, under the facts developed, this testimony was not admissible as a part of the *res gestae,* but we are clearly of the opinion that it was admissible as tending to prove the insanity of the defendant at the time of the commission of the act. It is insisted by the State that his statements as testified to by these witnesses were self-serving and therefore under the well-settled rules of law were not admissible; however, it is sufficient to say upon this proposition that the distinction must be kept in view as to the actions and statements of a defendant who has interposed as a defense that of insanity, which tends to demonstrate his mental condition at or near the time of the commission of the act, and a mere self-serving statement. If there was no issue in this cause as to the mental condition of the defendant at the time of the commission of the homicide, then it might be

truly said that any statements he made as to what the deceased intended to do would be merely self-serving statements, and should be excluded; but when his sanity at the time of the commission of the act with which he is charged is directly involved, then under the well-settled rules of procedure, great latitude is allowed in making the investigation touching the subject, and any statements or any actions or conduct closely connected as it was shown to be in this case, which has any tendency to throw light upon the mental condition of the defendant, in our opinion, is clearly admissible in evidence. The admission of this testimony does not mean that the jury are to be misled by any statements that the defendant may have made, for it is the province of the court, where statements are made tending to show his mental condition, and are admitted for that purpose alone, by an appropriate instruction to limit the purpose of the testimony thus introduced.

In State v. Kring, 64 Mo. 591, the contents of certain letters written by the defendant were offered in evidence as tending to show the mental condition of the defendant. These letters were merely statements reduced to writing made by the defendant, and Judge NAPTON, speaking for this court as to the admissibility of such statements, thus gave expression to the views of this court upon that subject. He said: "Although we have been unable to find any case which decides precisely the question involved in this case, it seems to be generally conceded that, when the question is concerning the sanity or insanity of a person, his acts and declarations previous to, and up to the period, when his capacity for action or his responsibility for his acts is called in question, and even subsequently, are admissible to throw light on the condition of his intellect at the time such acts or declara-

tions occur.    His letters are certainly as valuable proof as his verbal declarations.''

In Encyclopedia of Evidence, vol. 7, p. 447, we find the rule thus announced in the text: ''The oral declarations of the defendant in a criminal case, tending to show his insanity, may be received in evidence, as well as his written declarations previous to and up to the time of the act in question, or even subsequently.   Statements of third persons, not made to nor in the presence of the accused alleged to be insane, are inadmissible.''   We find the case of State v. Kring, supra, cited in the notes in support of the rule announced in the text.   See also in support of the rule announced by this court in the 64 Mo., Massengale v. State, 24 Tex. App. 181; Com. v. Pomeroy, 117 Mass. 143.

## V.

Error is assigned by counsel for appellant upon the action of the court in refusing to give instruction ''H'' which was requested by the defendant.   This instruction was as follows:

''The court instructs the jury that the law of self-defense is applicable alike to the insane as to the sane; that both defenses are consistent, and if you find on one or both such defenses in favor of the defendant, you will return your verdict of not guilty.''

In treating of this complaint it is not out of place to say that it is difficult to say what the testimony may develop at the next trial of this case, and if upon a retrial of this cause there is evidence sufficient to authorize the court to predicate an instruction upon both theories of defense made in this prosecution, that of insanity and self-defense, then this instruction should be given.

In State v. Wade, 161 Mo. 441, an instruction precisely in the same form was refused by the court,

and it was ruled that such refusal was error which authorized the reversal of the judgment. The trial court upon the disclosures of the record in this case presented instructions declaring the law applicable to the theory of self-defense and insanity. If there was any evidence sufficient to warrant an instruction upon the theory of self-defense, then the instruction now under consideration should have been given. However, we repeat, that the testimony upon the theory of self-defense and insanity upon the retrial of this cause must control the court in presenting the law of the case. In our opinion, the testimony upon the theory of self-defense as disclosed by this record is very slight, and it is doubtful whether it forms a sufficient basis upon which to predicate an instruction upon that defense, and if the refusal of this instruction was the only error complained of, this court would seriously hesitate before reversing the judgment and remanding the cause upon that ground alone.

## VI.

This leads us to the consideration of the complaint on the part of the appellant that the court improperly admitted certain testimony tending to show threats made on the part of the defendant. The basis of this complaint is directed largely to the contention that the threats were too remote and therefore should have been excluded. We are unable to agree with learned counsel for appellant upon this proposition. This court in State v. Wright, 141 Mo. 333, fully recognized the admissibility of threats made by a defendant against the party charged to have been killed, and it was in that case expressly ruled that "remoteness does not affect the question of competency; it only goes to the weight of the evidence," citing in support of such ruling State v. Adams, 76 Mo. l. c. 357; 1 Bishop, New Crim. Proc., sec. 1110, and cases cited.

In Goodwin v. State, 96 Ind. l. c. 552, it was said by that court that, "threats against life are always admissible against an accused, but their remoteness from the time of the homicide is a circumsance to be considered in determining the weight and effect to be assigned them."

We have reached the conclusion upon this proposition that there was no error committed in the admission of the testimony tending to show threats upon the part of the defendant. As to the weight of such testimony, that was a question to be considered by the jury after fully considering the nature and character of the threats, the circumstances under which they were made and their remoteness from the time of the commission of the homicide. This conclusion is supported by numerous well-considered cases, as well as the text-writers upon the subject of evidence. [State v. Ford, 3 Strobhart (S. C.) 517; Redd v. State, 68 Ala. l. c. 497; State v. Campbell, 35 S. C. l. c. 32; Everett v. State, 62 Ga. 65; Underhill on Crim. Ev., sec. 329; 1 Wigmore on Ev., sec. 108.]

## VII.

It is next insisted that the court erred in failing to instruct the jury upon manslaughter in the fourth degree. It is sufficient to say as applicable to that contention that we have read in detail the entire evidence as disclosed by the record, and in our opinion such disclosures furnish no basis for an instruction upon that grade of offense.

## VIII.

Numerous complaints are urged by counsel for appellant predicated upon the admission and exclusion of evidence offered at the trial. As before indicated, to undertake to discuss in detail the numerous errors assigned upon this subject would extend this opinion far beyond reasonable bounds; hence we shall be con-

tent in a general way with indicating our views upon this subject. In the first place, at this age of our jurisprudence, the rules of evidence applicable to the trial of criminal causes are well-settled.    Upon the subject of insanity as a defense in a criminal prosecution, great latitude is allowed in the investigation of that subject.   In determining the sanity of the defendant evidence of anything and everything which at least in some substantial way would have a tendency to show that the nervous organization was affected is admissible. · Now, while the details of the many little disputes and disagreements between the deceased and his wife prior to the homicide need not be and ought not to be admitted in evidence, yet if there were any threats made by the deceased, the home life of the defendant and his stepmother and his father in a general way might be inquired about; any threats of violence to the stepmother, or to the defendant or to his sisters; in fact, all the facts which would tend to show any intense feeling of excitement, or which in any way indicated that the stepmother and the sisters had impressed the defendant with the idea that they looked to him for protection, are all matters of legitimate inquiry.   Now, we repeat, by this we do not mean that the minute details and the statements of every little disagreement of dispute prior to the commission of the homicide between Mr. Porter and his wife, should be gone into in the development of the evidence at the trial; but we simply indicate that in a general way such occurrences or any threats of violence which might have a tendency to affect the nervous organization of the defendant, are all questions about which the triers of the fact have the right to be informed.   In other words, upon the retrial of this cause there should be kept constantly in view the fundamental rule of evidence that testimony in order to be admissible should

State v. Porter.

at least tend to prove or disprove some of the issues involved in the proceeding.

We see no necessity for further discussing this subject, for doubtless the trial court upon a retrial of this cause, in the admission and exclusion of evidence, will be governed and controlled by the well-settled rules of evidence applicable to trials of that character.

## IX.

We have indicated our views upon the main propositions disclosed by the record before us. This is a sad, as well as a most serious case. If the defendant, while in a mental condition in which he was enabled to distinguish right from wrong, without a sufficient provocation, took the life of his father, then it may truly be said that he should suffer such penalty as may be meted out to him by an impartial jury of his county. On the other hand, under the laws of this State he has the right to have his case and his defenses presented to the jury in conformity with the recognized rules of law and procedure applicable to trials in criminal cases. We have pointed out in what particulars the trial court failed to conform to the requirements of the law in such cases; which results in the conclusion that the judgment of such court should be reversed and the cause remanded. It is so ordered.

All concur.