THE STATE v. EARL WHITENER, Appellant.—46 S. W. (2d) 579.

Division Two, February 17, 1932.

*Davis & Damron* for appellant.

*Stratton Shartel*, Attorney-General, and *Henry H. Stern*, Assistant Attorney-General, for respondent.

840

HENWOOD, J.—By an indictment filed in the Circuit Court of Madison County, the defendant and four others were jointly charged (under Sec. 4064, R. S. 1929) with stealing eight head of neat cattle, to-wit, eight steers, the property of Robert Whitener. Severances were taken, and the defendant was tried alone. The jury found him guilty of grand larceny, and assessed his punishment at imprisonment in the penitentiary for two years, and added to their verdict a recommendation that he be paroled. He was sentenced in accordance with the verdict, and appealed, having applied for a parole and a new trial without avail.

The State's evidence, in chief, is substantially as follows:

The defendant lived on a farm, about thirteen miles from Fredericktown, in Madison County. About five o'clock in the afternoon of October 23, 1928, he went to the home of Gladys Senters, a neighbor, and asked her to come to his house that evening and stay with his wife while he went to Fredericktown "to see about a calf." She went to his home about "a quarter to seven," and he left "about seven or a quarter after." He had not returned at midnight, when she and his wife retired. The next morning, he said he "came in about two or two-thirty," and that his late arrival was caused by trouble with the lights on his car. A few days after October 23, 1928, Robert Whitener, a distant relative of the defendant, discovered that a big black steer with long horns, a big red steer with knobby horns, a roan steer with a white face, a red steer with a white face, a spotted steer, and three red steers, shorthorns, were missing from his herd of forty or fifty steers which he kept in a pasture, about a quarter of a mile south of Fredericktown, in Madison County. Upon investigation, he learned that the defendant ordered a truck in the evening of October 23, 1928; and that between one and two o'clock the next morning, the morning of October 24, the defendant and Mr. Goldsmith, the driver of the truck, loaded his (Robert Whitener's) eight missing steers in the truck at Mr. Bone's cattle chute, about a quarter of a mile from the pasture; and that the defendant shipped the steers to St. Louis in the truck, sold them, and received the proceeds of the sale. Following this investigation, he and Mr. Bone and Mr. Goldsmith and the sheriff went to the defendant's home

and talked to him about the steers. The defendant admitted the loading and shipping of some cattle at the time and place in question, and, at first, insisted that he bought the cattle from other farmers in the neighborhood; but, finally, he admitted that he took the steers in question, and offered to pay for them if given "a little time" to get the money. It was then suggested that the defendant should go, with these men, to his father's home and talk to his father about the matter, and the defendant said, "No, I don't want him to know it; if you fellows will keep it a secret awhile on me and don't let it out, I will get the money—give me a week or two's time and I'll get the money and pay for the cattle; I'd rather my dad would never know it." When told "he had to go," the defendant said, "Well, if I have to go, I'll go." He went, with these men, to his father's home, where they told his father, in his presence, "what had happened." His father agreed to pay for the steers, and did so a day or two later.

Insanity of the defendant was interposed as his defense. His father and mother testified: Ten children were born of their marriage, four of whom were dead at the time of the trial. Their oldest child, a son, developed epilepsy at the age of five years, and died, as the result of that affliction, at the age of fourteen years. The defendant, their fifth child, was twenty-two years of age at the time of his marriage and twenty-eight years of age at the time of the trial. He had been physically and mentally weak and of a nervous disposition from the time of his birth. He had a severe attack of fever when two years of age. He attended school between the ages of six and seventeen years, but lacked the mental capacity to make much progress at school. He had shown a preference for the company of children and an inclination to do childish things ever since he was seven years of age. His mental weaknesses became very noticeable after his marriage, when he undertook to manage a farm and to buy and sell and trade livestock. On cross-examination, the defendant's father admitted that the defendant had been elected and had served as a school director. Dr. E. F. Hoctor testified: He had specialized in nerve and mental diseases. He was then superintendent of the State Hospital at Farmington, and formerly was superintendent of the State Hospital at Nevada. The defendant was under his observation about sixty hours in September, 1929, and he obtained a history of the defendant from his father and mother. His examination disclosed that defendant had "a poor general physical status, asymmetry from contour, astigmatism, low mentality, unequal eyebrows, unequal position of ears, unequal expansion of jaws, and protusion of the tongue to the right side." After subjecting the defendant to standard tests for menality, it was his conclusion that the defendant was a victim of the form of amentia known as imbecility, and

that he had no more mentality than a normal child of the age of six and a half years. In his opinion, the defendant was not capable of knowing right from wrong as applied to the crime of stealing cattle. One local physician testified that the defendant's mind was about the same as the mind of a normal child seven or eight years of age. Another local physician testified that the defendant had no greater mental development than a normal child ten years of age. The testimony of several witnesses concerning business transactions with the defendant tends to show that he was mentally deficient, and one of these witnesses expressed the opinion that the defendant's mind was unsound at the time of the alleged offense.

In rebuttal for the State, several of the defendant's neighbors and intimate acquaintances testified that they had never observed anything peculiar in his mentality, and two of these witnesses testified that the defendant voted at the general election in November, 1928.

I. We agree with the contention that the trial court erred in admitting the testimony of the State's witness Mary J. Settle which tends to connect the defendant with the theft of cattle belonging to said witness and her husband, in July, 1928. This testimony was not competent for any purpose, and was highly prejudicial to the defendant.

II. We also agree with the contention that the trial court erred in excluding the record of the proceedings of the Probate Court of Madison County, wherein it appears that Earl Whitener, the defendant in this case, was found and adjudged to be a person of unsound mind, on November 19, 1928. The State objected to this evidence, and it was excluded, solely on the ground that it is not binding in this case. True, said judgment of the probate court, rendered on November 19, 1928, is not conclusive on the plea of insanity in this case. However, the proof of said judgment was clearly admissible on the issue of whether or not the defendant was insane at the time of the alleged offense, "on or about October 23rd, 1928," and, manifestly, the exclusion of such proof was prejudicial to the defendant. [3 Wigmore on Evidence (2 Ed.) sec. 1671; State v. Porter, 213 Mo. 43, 111 S. W. 529; State v. Glenn (Mo. Sup.), 262 S. W. 1030; Smedley v. Commonwealth, 138 Ky. 1, 127 S. W. 485; Bond v. State, 129 Tenn. 75, 165 S. W. 229.] "Upon the subject of insanity as a defense in a criminal prosecution, great latitude is allowed in the investigation of that subject." [State v. Porter, supra.] "Where such issue (insanity) is tendered, evidence is admissible that the party was insane both before and after the homicidal act, as tending to show his mental condition at the time the act was committed."

[State v. Glenn, supra.] "The inquiry under the plea of insanity was whether the defendant had capacity and reason sufficient to enable him to distinguish between right and wrong as to the particular act he was then doing—a knowledge and consciousness that the act he was doing was wrong and criminal, and would subject him to punishment. Evidence of his conduct and condition before, at the time of, and subsequent to the doing of the thing charged is admissible to enable the jury to arrive at a proper conclusion as to the defendant's mental *status* at the time he did the thing complained of. This is true generally as to statements and acts of the defendant. This rule would seem to include an inquisition upon reason, and there is much authority in support. [2 Greenleaf on Evidence, sec. 371.] Mr. Greenleaf says: 'An inquisition taken under a commission of lunacy is admissible evidence, but not conclusive for the party's own favor.' " [Bond v. State, supra.]

We find no merit in the other complaints relating to the admission and exclusion of evidence.

Other questions are presented here, but they were not preserved for our review in the motion for a new trial, and, therefore, will not be considered. [Sec. 3735, R. S. 1929; State v. Standifer, 316 Mo. 49, 289 S. W. 856.]

For the reasons hereinabove mentioned, the judgment is reversed and the cause remanded. All concur.