STATE of Missouri, Respondent,

v.

Anthony C. MOORE, Appellant.

No. ED 89758.

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 26, 2008.

Lisa M. Stroup, Assistant Public Defender, St. Louis, MO, for appellant.

Shaun J. Mackelprang, Assistant Attorney General, Jefferson City, MO, for respondent.

PATRICIA L. COHEN, Judge.

### Introduction

Defendant Anthony Moore appeals the judgment of conviction for two counts of murder in the first degree on the grounds that the trial court erred in: 1) overruling Defendant's motions for judgment of acquittal; and 2) admitting evidence of Defendant's mental condition months after the charged offenses.

### Background

Defendant was the father of Toni Moore, two years of age, and Kanyé Anderson, nine months. On the afternoon of August 8, 2004, Defendant picked up his daughter Toni from the home of Toni's mother, Stephanie Jones–Phillips. During the 20 to 30 minutes that Defendant spent at her house, Ms. Jones–Phillips did not notice anything unusual in his behavior.

Later that afternoon, Defendant picked up Kanyé from Kanyé's mother, Iesha Anderson. Ms. Anderson testified that Defendant was behaving normally and she had no concerns about allowing him to take Kanyé.

With their mothers' consent, the children stayed overnight with Defendant at Defendant's step-mother's house. On the morning of August 9, 2004, Defendant and his sisters, Tara Harris and Tracy Harris, fed and bathed the children and played with them. Neither sister noticed any-

thing strange about Defendant's behavior. At approximately 11:00 a.m., Defendant left the house with the intention of having the children professionally photographed.

Around 1:30 p.m., Defendant called Ms. Jones–Phillips and asked her to pick up Toni. When Ms. Jones–Phillips told Defendant that she was at work, he replied, "Never mind." Defendant's speech and tone were normal.

Around 3:00 p.m., Defendant went to a riverside park just south of the Chain of Rocks Bridge in St. Louis. Defendant drove his car down a boat ramp and into the mud of the Mississippi River. He removed Toni and Kanyé from the car and carried them to the front of the car, where he killed them by holding their faces in the mud until they suffocated. The autopsy reports indicated that both children had abrasions on their faces and mud in their trachea and esophagi.

Adrian Williams, a witness who was at the park at the time of the murders, testified that he had planned to park his car on that boat ramp, but decided to park elsewhere when he saw Defendant's car in the bank of the river and observed Defendant crying by the driver-side door. Mr. Williams later saw Defendant walk out of the park crying and covered in mud. When Defendant walked by Mr. Williams' car, Mr. Williams heard him "uttering something" that did not make sense.

While running errands, Defendant's aunt, Venita Burnett, had passed Defendant on the street and, recognizing that something was wrong, rushed home to pick up Tara and Tiarra Harris, another sister of Defendant. At trial, Tara testified that the group of women found Defendant walking down the street with mud on his legs, hands, and face. Defendant was foaming at the mouth and saying something unintelligible. The women exited the car and tried to talk to Defendant and find out where the children were. Defendant acted as though he did not see them and continued speaking in what "sounded like tongues." Tara instructed Tiarra to stay with Defendant while she and Ms. Burnett looked for the children.

Tara and Ms. Burnett found Defendant's car in the mud at the bottom of the boat ramp. The front end of the car was damaged, the driver's door was open, the engine was running, and the transmission was in reverse gear. Tara searched the inside of the car for the children before walking around to the front of the car where she discovered their bodies.

At about 3:00 p.m., Officer Sean Mallon responded to the park for a call that a black male had drowned his children in the river. When he reached the park, numerous bystanders waved him down and directed him to the boat ramp. A woman covered in mud, whom he identified as Defendant's cousin, walked up the ramp to Officer Mallon and told him that Defendant killed the children and she had tried to save them.

Around the same time, Detective Robert Robinson responded to a disturbance call regarding a "violent OBS."[1] When Detective Robinson arrived to the area, Defendant's sister waved him down. Detective Robinson testified that the sister was "hysterical" and said, "Hey, my brother just kind of flipped out, and he took off running down the street." She informed Detective Robinson that Defendant was shirtless and covered in mud.

1. The acronym "OBS" refers to an individual with organic brain syndrome. Organic brain syndrome is a medical condition that may result from a head injury or toxic occurrence in the brain, such as the use of drugs or alcohol. Based upon the record, it appears that law enforcement officers use this term to describe someone who has "something wrong with his brain" or is "a mental person in distress."

Detective Robinson located Defendant and observed that, in addition to being shirtless and muddy, Defendant "was very sweaty" and he "had like a froth around his mouth, and he kept shouting something loud over and over and over, and he had his fists clenched, and he just seemed like he was in a violent rage." Detective Robinson started to get out of his car, but Defendant "charged" at him, so he closed the door, rolled down the window, and tried to converse with Defendant from inside the vehicle. Defendant continued walking down the middle of the street and "chanting something." Believing Defendant to be dangerous, Detective Robinson called for assistance and specifically requested the help of an officer with a Taser, the police department's first level of non-lethal force for stopping aggressive subjects.

Several police officers in marked patrol cars responded to the scene, including Officer Patrick Hokamp. Officer Hokamp testified that Defendant "was speaking in an incoherent language, and the look on his face was dazed like he didn't know where he was." Approximately six police officers surrounded Defendant. When Defendant, ignoring Officer Hokamp's orders to stop moving, walked toward him clenching his fists, Officer Hokamp deployed his Taser, giving Defendant a five-second electrical shock. Defendant fell to the ground but refused to stop moving or put his hands behind his back. After Officer Hokamp administered another five-second charge, Defendant complied and was handcuffed. Once Defendant was placed in an ambulance, his sisters informed the officers that he had just killed his children.

The State charged Defendant with two counts of murder in the first degree. Defendant waived his right to a trial by jury, and the court tried the case on April 9 and 10, 2007. At trial, Defendant presented testimony of two psychiatrists in support of his defense that he was not guilty by reason of mental disease or defect.

At the conclusion of trial, the court issued a "Findings of the Court" holding that Defendant's acts were done knowingly and after deliberation. The trial court found that the defense presented substantial evidence through two qualified forensic psychiatrists that Defendant suffered from a mental disease or defect at the time of the homicides. However, the trial court concluded that the two expert witnesses were "not credible in that the diagnoses were based primarily on witnesses' observations *after* the children were killed." Thus, the trial court held that Defendant's evidence was insufficient to rebut the legal presumption of sanity. The court found Defendant guilty and denied his motions for judgment of acquittal. On May 25, 2007, the trial court sentenced Defendant to two concurrent terms of life in prison without the possibility of parole. Defendant appeals.

### *Standard of Review*

In a court-tried case, the sufficiency of the evidence is determined by the same standard as in a jury-tried case. *State v. Harris,* 774 S.W.2d 487, 491 (Mo. App. E.D.1989). The State must establish beyond a reasonable doubt that a defendant committed each element of the offense charged. *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). The relevant question on review of the sufficiency of evidence is whether, "after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

## Discussion

■ In his first point on appeal, Defendant claims the trial court erred in denying his motions for judgment of acquittal because the defense established by a preponderance of the evidence that Defendant lacked responsibility for his actions because he suffered from a mental disease at the time of the charged criminal conduct.

### Expert Witness Testimony

Dr. Bruce Harry, a forensic psychiatrist hired by the defense, examined Defendant approximately one year after the deaths of Toni and Kanyé. In Dr. Harry's opinion, Defendant suffered from Psychotic Disorder Not Otherwise Specified when he killed his children. Dr. Harry concluded that, as a result of this condition, Defendant was not able to appreciate the nature, quality, and wrongfulness of his actions at the time of the crimes.

Dr. Harry based his conclusion that Defendant suffered from a temporary psychotic disorder on Defendant's: 1) disorganized speech; 2) disorganized behavior, which included foaming at the mouth and wandering around; 3) commission of the crimes during daylight and in plain sight; 4) failure to try to clean himself; 5) characterization as "OBS violent" by law enforcement and the police officers' request for a CIT officer, an officer specialized in working with mentally ill individuals in severe distress; 6) refusal to yield to uniformed law enforcement officers in the face of lethal cover and threat of Taser application; and 7) almost immediate receipt of antipsychotic medication from EMS. Dr. Harry weighed these factors against those indicating that Defendant was able to understand the nature, quality, and wrongfulness of his actions, which included the following facts: 1) Defendant mostly submerged the children in the mud; 2) Defendant left the scene; 3) prior to his arrest, Defendant reportedly told one of his sisters, "She's dead"; and 4) upon being informed that his children were dead, Defendant responded, "I know." Dr. Harry concluded that these factors suggesting sanity and deliberation did not outweigh those indicating that Defendant suffered from a mental disease or defect excluding responsibility.

On cross-examination, Dr. Harry acknowledged that his "balancing test" did not take into account certain factors that suggested Defendant understood his actions. Dr. Harry admitted that the numerous steps Defendant took in committing the crimes—such as driving down the boat ramp, getting out of the car, carrying the children to the front of the vehicle, putting them down in the mud, and holding their faces in the mud—could indicate that Defendant knew what he was doing and had a plan and a purpose. Dr. Harry also conceded the possibility that Defendant manifested the psychotic behavior after committing the crimes. In other words, Defendant's psychotic behavior might have been triggered by the trauma of killing his children.

Dr. John Rabun, a forensic psychiatrist appointed by the court upon the State's motion for mental examination, also testified. Dr. Rabun performed his evaluation approximately two years after the crimes were committed. Like Dr. Harry, Dr. Rabun found that Defendant did not exhibit any signs of a mental disease or defect before he committed the crimes or at the time of his examination, and he concluded that Defendant suffered from Psychotic Disorder Not Otherwise Specified for the brief period of time during which he killed his children. On cross-examination, Dr. Rabun also acknowledged the possibility that Defendant knew at the time of the murders that his actions were wrong and then suffered a psychotic disorder caused by the trauma of killing his children.

Section 552.030.1 provides that a "person is not responsible for criminal conduct if, at the time of such conduct, as a result of mental disease or defect such person was incapable of knowing and appreciating the nature, quality, or wrongfulness of such person's conduct." Mo.Rev.Stat. § 552.030.1 (2008). Section 552.030.6 provides that:

> All persons are presumed to be free of mental disease or defect excluding responsibility for their conduct.... The issue of whether any person had a mental disease or defect excluding responsibility for such person's conduct is one for the trier of fact to decide upon the introduction of substantial evidence of lack of such responsibility.... Upon the introduction of substantial evidence of lack of such responsibility, the presumption shall not disappear and shall alone be sufficient to take to the trier of fact.

Mo.Rev.Stat. § 552.030.6 (2008). The statute makes clear that when an individual commits a crime, the legal presumption of sanity is very strong. *See e.g., State v. Bradshaw*, 593 S.W.2d 562, 568 (Mo.App. W.D.1979).

■■■ A successful insanity defense requires a defendant to first present substantial evidence that he lacked responsibility for the offense because he suffered from a mental disease or defect at the time of the offense. *State v. Bass*, 81 S.W.3d 595, 615 (Mo.App. W.D.2002). Assuming the defendant satisfies this burden, he must then overcome the statutory presumption of sanity by showing by a preponderance of the evidence that he suffered from a mental illness that precluded him from appreciating the nature, quality, or wrongfulness of his criminal conduct. *Id.* The presumption that a defendant is free from mental disease or defect remains throughout the proceeding and alone is enough to sustain a finding of sanity even

when a defendant presents substantial evidence to the contrary. *Bradshaw*, 593 S.W.2d at 568.

■ Even where a defendant presents substantial and uncontroverted evidence of a mental disease, a trial court is not required to grant a judgment of acquittal. The trial court is free to accept or reject Defendant's evidence of mental disease or defect. *State v. Bell*, 798 S.W.2d 481, 487 (Mo.App. S.D.1990). As previously stated, in the absence of expert testimony that a defendant was not suffering from a mental disease or defect excluding responsibility at the time of the crime, the statutory presumption of sanity standing alone is substantial evidence to sustain a court's finding on this issue. *State v. Lee*, 654 S.W.2d 876, 881 (Mo. banc 1983).

A review of the record persuades us that there was substantial evidence in this case for the court to find Defendant was not suffering from a mental disease or defect excluding responsibility when he killed his children. Defendant's family stated that Defendant was behaving normally and enjoying time with his children before he left their house at 11:00 a.m. Between the hours of 11:00 a.m. and 3:00 p.m., Defendant made various phone calls during which he spoke appropriately and coherently. Defendant's medical records indicate that, upon his admission to Forest Park Hospital that afternoon, Defendant was oriented as to time, place, and person. Furthermore, the State's cross-examination of Defendant's medical experts revealed that their diagnoses were based primarily upon witnesses' observations of Defendant after he killed his children. Both medical experts acknowledged the possibility that Defendant knew at the time he was killing his children that his actions were wrong and then behaved in a disorganized manner as a result of the trauma of having killed his children.

Thus, the trial court did not err in holding that Defendant's evidence was insufficient to rebut the legal presumption of sanity and denying Defendant's motions for judgment of acquittal. Defendant's first point is denied.

■ In his second point on appeal, Defendant claims the trial court erred in overruling defense counsel's objections to the admission of evidence that Defendant was not psychotic one to two months after he suffocated his children. Specifically, Defendant asserts that he was prejudiced by testimony given by the victims' mothers stating that they spoke to Defendant by telephone in the months after the murders and Defendant was able to have coherent conversations with them.

■ As a general matter, the trial court enjoys considerable discretion in the admission or exclusion of evidence. *State v. Gonzales*, 153 S.W.3d 311, 312 (Mo. banc 2005). In addition, we review the trial court's ruling "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Forrest*, 183 S.W.3d 218, 223–24 (Mo. banc 2006), *quoting State v. Middleton*, 995 S.W.2d 443, 452 (Mo. banc 1999).

■ The key inquiry when a defendant claims that he is not guilty by reason of insanity is "whether there existed substantial evidence of defendant's mental irresponsibility at the time of the homicides." *State v. Carr*, 687 S.W.2d 606, 610 (Mo. App. S.D.1985). Any facts that would tend to establish Defendant's mental state at the time of the crimes charged may be relevant. *See e.g., State v. Raine*, 829 S.W.2d 506, 510–11 (Mo.App. W.D.1992). The law does not limit the period of time that an inquiry into defendant's mental condition may cover. *State v. Jackson*, 346 Mo. 474, 142 S.W.2d 45, 48 (1940); *see also State v. Whitener*, 329 Mo. 838, 46 S.W.2d 579, 581 (1932) ("Evidence of [de-fendant's] conduct and condition before, at the time of, and subsequent to the doing of the thing charged is admissible to enable the jury to arrive at a proper conclusion as to the defendant's mental status at the time he did the thing complained of."). In the instant case, the testimony of Ms. Jones–Phillips and Ms. Anderson was relevant to the principal issue in the case—namely, whether Defendant suffered from a mental disease or defect at the time he committed the crimes charged.

Defendant relies on *State v. Brizendine* for the proposition that evidence of a defendant's mental condition after a crime is committed is inadmissible. 391 S.W.2d 898, 901–2 (Mo.1965). In *Brizendine*, the Supreme Court held that the record did not establish insanity or mental irresponsibility. *Id.* at 902. The Court reviewed the record, which included the report of an examining psychiatrist, and found that "[n]o witnesses testified in connection with their observations before, at or after the commission of the homicide that defendant lacked the requisite mental capacity to commit the crime." *Id.* at 900, 902. The Court did not, as Defendant claims, hold that evidence of the defendant's mental condition after the crime was inadmissible. Rather, the Court considered this evidence and determined that it did not establish insanity or mental irresponsibility. *Id.* at 902. Moreover, when considering whether the defendant was entitled to a jury instruction on his insanity defense, the Court considered evidence of the defendant's "unusual conduct before, during and after the killing." *Id.* at 902–03.

Clearly, Defendant's mental condition and ability to maintain a coherent conversation weeks or months after the crimes is not determinative of his mental state at the time of his criminal conduct. However, such evidence is relevant to determining whether Defendant suffered any continuing, permanent mental incapacity that

would relate to the time of the homicides. *See e.g., Brizendine,* 391 S.W.2d at 902. Thus, the testimony of the victims' mothers was logically relevant to the issue of Defendant's mental state at the time he committed the charged offenses.

 Furthermore, Defendant was not prejudiced by the testimony in question because his mental condition following the murder was the subject of extensive examination during the testimony of Defendant's own witnesses. "Generally, a party cannot complain about the admission of testimony over his objection, where evidence of the same tenor has been admitted without his objection." *State v. Griffin,* 876 S.W.2d 43, 45 (Mo.App. E.D.1994). Drs. Harry and Rabun both testified, without objection, that Defendant did not exhibit any psychotic or disorganized behavior at the time they conducted their examinations; Defendant had suffered no relapses since the murders; Defendant was coherent at the hospital following the murders; and Defendant had not received any psychiatric treatment or psychotropic drugs since the paramedics administered Haldol and Ativan on the day of the murders. Both psychiatrists made clear that, in their opinions, Defendant suffered a psychotic disorder for only a few hours. Thus, we conclude that the trial court did not err in admitting Ms. Jones–Phillips' and Ms. Anderson's testimony regarding Defendant's behavior in the months after the murders. Defendant's second point is denied.

### Conclusion

The judgment is affirmed.

KURT S. ODENWALD, P.J., and GLENN A. NORTON, J., Concurs.