STATE OF MISSOURI, Respondent, v. ROLLIE LASTER, Appellant, No. 44919—293 S. W. (2d) 300.

Court en Banc, July 9, 1956.

Rehearing Denied July 31, 1956.

*Thomas P. Rose* for appellant.

*John M. Dalton,* Attorney General, and *W. Don Kennedy,* Assistant Attorney General, for respondent.

[301]   EAGER, J.—Defendant and six others were indicted jointly on November 23, 1954, for the murder of Walter Lee Donnell, who was slain during the riot at the Missouri Penitentiary on the evening of September 22, 1954. All of the defendants were inmates of the penitentiary, as was Donnell. On December 6, 1954, counsel was appointed for this defendant. That counsel assiduously prepared the defense, ably tried the case and now prosecutes this appeal. A severance was granted this defendant on motion; certain other motions were filed and overruled, but no point is made here on those rulings. At the trial on January 24-27, 1955, defendant was found guilty by the jury and the death penalty was assessed. A motion for new trial was filed, heard and overruled, defendant was duly sentenced, and this appeal was regularly taken.

In view of the limited scope of the points made on this appeal, it will not be necessary to review all the evidence in detail. It is not contended here that the evidence was insufficient to sustain a conviction. Donnell and James Creighton, another inmate, had been confined for two months or more in cells on death row, for their own protection. Defendant and one Stidham were confined there about July, 1954, to break up and separate a group of prisoners because, as the warden said, there was "trouble brewing." Death row consisted of thirty-two cells, located in the basement of "B" Hall; the same building contained both "B" and "C" Halls, located, respectively, on opposite sides of the entrance. All the premises described were within the walls of the penitentiary in Jefferson City. A minute description will not be necessary, but three heavy gates or doors made of steel bars separated death row proper from the main part of the building.

Comparatively early on the evening in question approximately 780 inmates of B and C Halls were released in a manner which is largely immaterial here. Many of them apparently milled around, inside and [302] outside, some destroying much property; a group estimated as consisting of 150 to 500 men descended into "B" basement between 6:00 and 7:00 P.M., and after the lapse of considerable time, and by employing various implements, it succeeded in battering

open all three doors leading into death row. What was done to and with the guard there is a separate and lengthy story, but the cell keys were obtained, and all inmates there who so desired were released from their cells, including Laster and Stidham. By this time many of these inmates had in their possession sundry miscellaneous weapons, including knives, filed-down screw drivers, ice picks, hammers, clubs, crow bars, iron rods and a large, long-handled sledge hammer. Considerable animosity had developed during confinement between Laster and Stidham on the one hand and Creighton on the other, and, rightfully or not, it is apparent that both Creighton and Donnell were regarded by some as "snitches"; however, the outspoken vituperation and threats seem to have been directed at Creighton. Almost immediately after the opening of the cells on death row several of the inmates tried to get into Creighton's cell, but he had succeeded in jamming the lock and he also managed to poke and beat them away with a wooden club and a piece of iron. Defendant Laster was in that group.

At some time thereafter during the evening and certainly prior to 10:30 P.M., Donnell's cell was entered, the door being opened with a key, and he was murdered there in a horrible manner. His body bore sundry stab wounds, front, back and elsewhere, at least two of these going clear through his heart; there were knife wounds on his neck, and his skull was partially crushed from a heavy blow, apparently made by the bloody sledge hammer found in his cell; there were other miscellaneous wounds and injuries on the body too numerous to describe. In addition to defendant's confession, which contained a direct admission that he stabbed Donnell several times in the chest while another inmate held his arms, there was oral testimony substantially tending to implicate defendant in the murder.

The three points made here are: (a) that the confession of Laster was inadmissible because not voluntary; (b) that the argument of the prosecuting attorney was so inflammatory as to require that the court declare a mistrial, even in the absence of objection; and (c) that the trial court should have reduced, and that this court should now reduce, the punishment to life imprisonment.

We first address ourselves to the admission of the confession. For that purpose it will be necessary to review more of the facts. When the state indicated that the confession was to be offered the court conducted a hearing thereon outside the presence of the jury. A St. Louis police lieutenant testified to the details of the interrogation of defendant; five other officers were present, all armed; defendant was handcuffed until he started to write the confession. This witness testified: that there were no threats, no promises, and no physical violence; that after defendant had been questioned for 15-20 minutes he indicated that he would make the statement and did so, first orally and then in writing. Certain corroborating evidence of

subsequent oral statements of defendant was also offered. Defendant presented no evidence at this preliminary hearing. At the resumption of the trial all six witnesses who were present at the time of the making of the confession testified in substance: that there were no threats, promises or physical violence; that after defendant had been interrogated for perhaps 15-25 minutes, during which time the officer in charge told him that they had a statement from another inmate (which the officer stated at the trial to be true) and told him, also, of certain details of the murder which they knew, defendant indicated a willingness to talk and proceeded to make an oral statement; that the handcuffs were then removed and defendant [303] himself wrote out the confession without dictation, taking perhaps 20-30 minutes to do so, and then signed it; that he was thereafter questioned further for perhaps 15-20 minutes about other features of the riot and fires, and he was then returned to a cell; that the whole interview lasted from an hour and a half to approximately two hours. There was some testimony that defendant was advised at the time that the statement might be used against him. There was evidence that he had been interrogated on perhaps three previous occasions for relatively short periods, one being for "an hour or so," but that he had then given no information; also, that at the last of these interviews he had been rather "bold and threatening," but had finally indicated that he wanted to "think it over." One officer testified without objection to highly material parts of the oral statements made by defendant just prior to his writing of the written confession. These were to the effect that he and two others killed Donnell and that he, Laster, stabbed the victim while one Kenton held him; these statements included also details of the injuries inflicted by the others. Objection was made to the written confession on the ground that it was not shown to have been made voluntarily and without threats, force, compulsion or promises of leniency.

Defendant's own testimony was to the effect that he was interrogated twice, once from between 3:00-4:00 A.M. until perhaps 10:00 A.M. on Friday, September 24, in the "classification" room, and next for two or three hours on Monday morning, September 27, in the "clubhouse," a building where athletic equipment was kept, and which was entirely separate from the other buildings. He testified that on each occasion he was struck, knocked down, kicked and beaten intermittently, if not continuously, by various officers; that after he was thus forced to write the statement he said that it was a "pack of lies" and was struck again; that he bore large bruises for two weeks. One inmate testified that he saw discolored places on defendant's left arm and back on September 29th; two others testified that from their place of confinement 300-400 feet away they recognized him and saw him removed from the "club-house," (presumably after the last interrogation), and that he was being supported

by officers, that his head was down on his chest, and his feet were dragging; another testified that he saw defendant with his arm and back discolored after the first interrogation. Defendant, with the six co-defendants, was transferred to the Federal Medical Center at Springfield, Missouri, on September 29, 1954. He was stripped and examined when he was admitted there and the examining physician testified that he made no complaints, but that he found ecchymosis (i.e. a condition similar to a black eye) on his left arm, right buttock and both legs; that he had no independent recollection of these, but that they must have been as large as or larger than a quarter or a half dollar to have been noted; that they were from one to ten days old and were not medically serious.

Defendant's evidence showed that he was in the group which was trying to force Creighton's cell, that he helped put the death row guard into a cell on death row, and that he later helped to move him upstairs to another cell; also, that defendant had an ice pick in his possession "that night," until he "lost it." He specifically denied, however, all participation in the death of Donnell.

Since the defendant chose not to introduce any evidence at the preliminary hearing, and the state made a prima facie case on the voluntary nature of the confession, the court necessarily ruled it admissible. State v. Gibilterra, 342 Mo. 577, 116 S.W. 2d 88, 93. In some instances our courts have considered also the evidence adduced before the jury in making a final ruling on the admissibility of a confession. State v. Gibilterra, supra; State v. Ramsey, 355 Mo. 720, 197 S.W. 2d 949, 954. Here [304] there was no motion to strike the confession at the conclusion of all the evidence. We rule the confession admissible, however, on the broader ground that on all the evidence there was no showing sufficiently strong to convince the court conclusively, or as a matter of law, that the confession was involuntary. The question was one for the jury, and an adequate instruction was given on this subject. Counsel cites the cases of State v. Powell, 258 Mo. 239, 167 S.W. 559; State v. Powell, 266 Mo. 100, 180 S.W. 851, and Turner v. Pennsylvania, 338 U.S. 62. In the Powell cases the facts were much different, it appearing from the state's evidence that a young and rather ignorant negro was kept under questioning by relays of officers for approximately eleven hours, and that suggestions were made to him which could well incite a hope of leniency if he confessed. It further appeared that there was a complete absence of any proof of guilt without the confession. Those cases, as does the Turner case, supra, merely stand for the proposition that a prisoner may be subjected to such continuous or repeated mental pressure or torture as to make a confession involuntary, though without physical abuse. In the present case we do not think that principle applicable, if any credence be given to the state's witnesses. Moreover, in defendant's own testimony he relied specifi-

cally and entirely on physical abuse. and beatings as forcing his confession, and he can hardly change his theory now to mental pressure. The two theories are dissimilar and, in a measure, conflicting. Counsel lays considerable stress on the following question to and answer of Lieut. Walter Eitzman who conducted much of the questioning: "Q And in the same length of time Mr. Laster told you all the statements voluntarily and wanted to reduce them to writing? A He didn't want to. He offered to after I asked him. He was willing, very cooperative." This was followed, however, by an explanation that defendant only began to talk after the witness explained to him in detail what they already knew, including the information that he, Laster, had gone into Donnell's cell and who had gone in with him, to which defendant replied: "Well, it looks like you know what you are talking about." It thus appears that the words "he didn't want to." were actually intended to mean that defendant only decided to talk after he found that the officers already had much of the information, but that he then did so of his own volition. We rule that the confession was admissible. Under our system of jurisprudence it is generally left to the jury to determine whether a confession was voluntary, unless the contrary appears so conclusively that the confession must be held involuntary as a matter of law. State v. Sanford, 354 Mo. 998, 1006, 193 S.W. 2d 37, 38.

We shall consider next the contention that the trial court erred in not reducing the punishment to life imprisonment and that this court should now do so. This point was expressly raised in the motion for new trial. Counsel argues here that the maximum penalty was imposed because of the prejudice of the jury engendered by the enormous property damage done in the riot, the state of fear and unrest aroused locally by the riot, and the highly inflammatory argument of the prosecuting attorney, the latter of which will next be considered. Counsel suggests that we have the power to reduce the punishment, citing State v. Rizor, 353 Mo. 368, 182 S.W. 2d 525, 529. That case merely recognized the right of the court under our statute, now § 546.430, RSMo., V.A.M.S., to reduce the punishment assessed by a jury, if deemed excessive; but the court deferred there to the ruling of the trial court on the question and recognized the usual rule that the assessment of the punishment is primarily the function of the trial jury. We note also Criminal Rule 27.04, which is identical with the statute. The paucity of reported cases in which this statute has been availed [305] of exemplifies the studied and persistent inclination of our courts to leave the fixing of the punishment to the trial jury. In the following cases this court has refused to reduce allegedly excessive punishments: State v. Mahan, Mo., 226 S.W. 2d 593; State v. McHarness, Mo., 255 S.W. 2d 826; State v. Burton, 355 Mo. 792, 198 S.W. 2d 19. In these cases, and others, it was held: that punishment will not be deemed excessive or the result of passion and

prejudice merely because it is the maximum fixed by statute; and that it is primarily the jury's function to fix the penalty, within the statutory limits, subject to the trial court's discretionary power to reduce it. To justify our interference at this stage, we must be able to say that passion and prejudice so clearly appear from the record that we may "confidently say that the trial court abused its discretion" when it declined to reduce the punishment to life imprisonment. State v. Mahan, Mo., 226 S.W. 2d 593. We cannot so state, and we, therefore, decline to exercise this highly extraordinary power. In so ruling we have considered also the arguments of the prosecuting attorney covered in the next point, as well as appellant's suggestions concerning the comparative guilt of others, and the life sentences imposed on each of the six other co-defendants. The latter information is no part of the record here, but even if it were, it should not change our ruling in this case. We suggest that if any relief is to be granted because of the inequality in punishment, it must come through executive clemency.

The remaining point concerns the arguments of the prosecuting attorney to the jury. No objections were made to these arguments, but appellant's counsel relies upon the duty of the trial court, of its own initiative, to declare a mistrial for argument so prejudicial and inflammatory as to prevent a fair trial. Of course, a trial court does have the right, and the duty, to intervene in a criminal case without objection being made, when it appears that such grievous error is being committed as to prevent a fair trial. State v. Rhoden, Mo., 243 S.W. 2d 75; but it is not always imperative that the court declare a mistrial when and if it sees fit to intervene, as counsel now suggests it should have done here. The strict limitations of this doctrine of intervention are ably discussed in the case of State v. Morris, Mo., 248 S.W. 2d 847. The principle has been recognized in Rule 3.27 of our Rules of Civil Procedure, but we find no counterpart in our criminal rules.

Counsel complains first of a portion of the prosecutor's argument in which he described the fear in the heart and mind of Donnell and the brutal manner in which he was slain. This part of the argument was not complained of in the motion for new trial, and, regardless of the matter of objections at the trial, we are precluded from considering it here under Rule 27.20. Counsel next urges reversible error in the argument of the prosecutor to the effect that the defendant was an incorrigible, that he tried to escape from Algoa and was transferred to the penitentiary, and that he was thereafter "out" only long enough to rob someone and get put back in jail. In some cases this argument might well be erroneous. Here, however, this evidence had been brought out in defendant's own testimony and voluntarily, apparently to keep the state from introducing it as impeachment; moreover, defendant's counsel had, in argument, strenu-

ously and with repetition invited the prosecutor to give "one good reason" why the defendant would voluntarily confess to this crime, after refusing to do so on prior occasions, and thus "give himself a ticket to the gas chamber or to life imprisonment." The prosecutor took up the challenge and the argument complained of above is part of his answer; completing the context, the prosecutor argued that the defendant was defiant and incorrigible, that he considered himself a great leader among the inmates of the penitentiary, that he was continuously in disciplinary trouble, that he was actually proud of everything he had done in the [306] penitentiary, including his part in this affair, and that his confession was an act of pride and defiance. There was some evidence to justify such an argument. We consider the above argument as retaliatory, and thus not erroneous. State v. Tiedt, 360 Mo. 594, 229 S.W. 2d 582, and cases there cited.

The last part of the argument complained of was as follows: "'* * * but here is the first one and here is the first jury and everybody is going to be watching what this jury does. * * * What is this man here? What can you do with him? Are you going to put him in the penitentiary for life? This cop hater, so he can rag the bulls and punks, be incorrigible and incite other riots, burn guards off their towers with gasoline? I say that what you do to this man is going to determine how the rest of the inmates in that penitentiary shall live in the future. If you say to those 3,000 or more inmates out there that you can kill a man in a riot, you can start riots, you can live incorrigibly, burn guards off towers with gasoline, destroy buildings out there so you can kill one guy you don't like, is that what you are going to say or are you going to say by your verdict to those people out there in the penitentiary that the people in Cole County aren't going to stand for that and they will put an end to anybody who does it, and I am asking this jury and I think the evidence fully justifies it, that we shall put an end to Rollie Laster by putting him in the gas chamber and bringing law and order to the penitentiary.'" No objection or motion was directed at this argument, but counsel insists that it was so inflammatory that the court should have declared a mistrial of its own initiative. We, therefore, consider the argument.

It has long been held that so long as a prosecutor stays within the record and its reasonable inferences, he may legitimately argue the necessity of law enforcement as a crime deterrent, and he may argue also that the responsibility for the suppression of crime and the protection of the public rests upon the trial juries. State v. Nasello, 325 Mo. 442. 30 S.W. 2d 132, 142, 143; State v. Lynn, Mo., 23 S.W. 2d 139, 141; State v. Marshall, 317 Mo. 413, 297 S.W. 63, 69; State v. Lucas, 316 Mo. 904, 292 S.W. 714, 717; State v. Murray, 316 Mo. 31, 292 S. W. 434, 438. And the authorities also hold that it is permissible for the prosecutor to draw and state his reasonable in-

ferences concerning the effect which may result from the jury's failure in this regard. See the cases just cited. It has been held entirely proper for the prosecutor to ask for a severe penalty as a deterrent to crime, if the jury believes the defendant guilty. State v. Leonard, Mo., 182 S.W. 2d 548; State v. Fletcher, Mo., 244 S.W. 2d 98; State v. Martin, Mo., 56 S.W. 2d 137. And it is not reversible error for the prosecutor to tell the jury that the community or the people will be watching the result of the trial. State v. Londe, 345 Mo. 185, 132 S.W. 2d 501, 507; State v. Carter, 345 Mo. 74, 131 S.W. 2d 546, 548. Such remarks have been characterized as a mere "rhetorical appeal." State v. Dipley, 242 Mo. 461, 147 S.W. 111, 117.

Looking at the foregoing argument in the light of these authorities, we hold that, in essence, it was a plea for the most severe punishment if the jury found defendant guilty, both as a deterrent to further crime in the penitentiary and as a protection to the community; this was coupled with a stated inference of the effect of a failure by the jury to impose the severe penalty requested. As such we do not think that the argument constituted reversible error. We hold that the inferences so drawn were permissible; much of the evidence on which they were based came from the defendant's own testimony, some of it voluntary; he had admitted the imposition of sundry disciplinary procedures, including solitary confinement and the "hole," for various infractions, some of which he could not even recall; he also admitted one escape and one attempt to escape; he admitted that he and two others threw gasoline on a guard [307] tower in an attempt to escape; a state's witness had testified that defendant was "bold and proud" to tell the story and of his accomplishment, and another testified that he had told during an interrogation how "he hated cops" and stated that "if he could get a gun he then would shoot his way out of there." As to his present incarceration, defendant had testified that: "I just held up a place in St. Joe and got caught." While there was no direct evidence that defendant had assisted in planning' or inciting this riot, we cannot say that an inference as to the possible inciting of future riots was unreasonable upon this whole sordid record.

Defendant cites the case of State v. Tiedt, Banc, 357 Mo. 115, 206 S.W. 2d 524. We think that the argument there was much more inflammatory than the one here, and the prosecutor there persisted in similar, or worse, arguments after the court had sustained several objections. A casual reading of the arguments in that case will demonstrate the distinctions. There was little or nothing in the present argument which the jury did not already know from the evidence; the legitimate argument of murder cases on such a record as this cannot always be effectively couched in polite or gentle language. We do not recede from what was said in the Tiedt case as to the restraint which should be exercised by prosecuting officials in cases

such as this, but we do not consider that case as sufficiently analogous to be controlling here.

The point now urged is simply that the trial court should have declared a mistrial. Even if we should assume that the argument was erroneous, it would not follow that the only proper action would be to declare a mistrial; the trial court has much discretion in such matters; it has seen and heard the witnesses and opposing counsel; it has heard the full arguments and has seen, in so far as such may be seen, their effect on the jury. The court might well have determined, even had it intervened on its own initiative, that a caution to the jury or some action other than a mistrial, would have been sufficient. We cannot, therefore, hold the court in error for not declaring a mistrial. The instructions were full and adequate and none of them are attacked here. The trial court considered this alleged error when the motion for new trial was presented, and it overruled the motion. We cannot say that the argument complained of was reversibly erroneous, and certainly we cannot confidently say that it was so prejudicial and inflammatory that the trial court abused its discretion in not acting upon its own initiative in declaring a mistrial. We have examined the entire record, and since we find no reversible error, the judgment and sentence will be affirmed. It is so ordered. All concur.

Date of execution fixed for Friday, August 24, 1956.