**STATE of Missouri, Respondent,**

v.

**Jack L. NOBLE, Appellant.**

No. 50750.

Supreme Court of Missouri,

Division No. 1.

Feb. 8, 1965.

Motion for Rehearing and Transfer to Court En Banc Denied March 8, 1965.

Thomas F. Eagleton, Atty. Gen., Howard L. McFadden, Asst. Atty. Gen., Jefferson City, for respondent.

Jack L. Noble, in pro. per.

WELBORN, Commissioner.

This is a proceeding under Supreme Court Rule 27.26, V.A.M.R. to set aside the appellant's conviction for murder in the first degree and sentence to life imprisonment therefor. The Cole County Circuit Court, after a hearing at which evidence was presented, refused the relief sought. This appeal followed.

The appellant, Jackie Lee Noble, was indicted by a Cole County Grand Jury on November 23, 1954, jointly with William R. Hoover, Paul Edward Kenton, James William Stidham, Rollie Laster, Don Wm. DeLapp and Joseph M. Vidauri, and charged with first degree murder in the death of Walter Lee Donnell on September 22, 1954. All of the above named were inmates of the Missouri State Penitentiary in Jefferson City and the death of Donnell occurred during the riot there on that date. For cases involving appellant's codefendants, see State v. Kenton, Mo.Sup., 298 S.W.2d 433; State v. Stidham, Mo.Sup., 305 S.W.2d 7; State v. Laster, 365 Mo. 1076, 293 S.W.2d 300, and State v. Vidauri, Mo.Sup., 293 S.W.2d 955.

Noble was tried separately in the Cole County Circuit Court, Judge Dimmitt Hoffman sitting as judge upon the disqualification of Judge Sam C. Blair. Mr. Sam W. James, Jr., now deceased, a member of the Cole County Bar, was appointed to defend Noble. Mr. Richard L. Daly of the St. Louis Bar assisted Mr. James.

On March 29, 1955, a jury returned a verdict finding Noble guilty of murder in the first degree and assessed his punishment at life imprisonment. Thereafter, James and Daly filed a motion for new trial on behalf of Noble. By an instrument, dated July 18, 1955 and signed by Noble, James and Daly, Noble withdrew his motion for new trial, waived his right to appeal and requested the court to enter judgment imposing sentence upon him according to the verdict of the jury. The court did so. The circumstances surrounding the withdrawal of the motion for new trial are the matters here at issue.

Noble alleged in his motion that he was placed in solitary confinement around Sep-

tember 18, 1954 and remained there until October 1, 1955. He alleged that, while he was awaiting the ruling of the court on his motion for new trial, he was approached by the prison warden and James and informed that, if he would withdraw his motion for new trial and waive his right to appeal, he would be released from solitary confinement. He alleged that he made several unsuccessful attempts to be released from solitary confinement "upon his merits." He further alleged he was thereafter advised by James that an agreement had been reached among James, the warden and Mr. James T. Riley, the Prosecuting Attorney of Cole County, to the effect that "petitioner would be released from solitary confinement if he would withdraw his motion for a new trial and waive his right to appeal." He was also advised, the petitioner alleged, that, if he refused to withdraw the motion and waive his right to appeal, he would be forced to remain in solitary confinement until his appeal had been disposed of. The motion states: "Petitioner after being so advised by his Court appointed attorney, Samuel W. James, Jr., went into agreement with the above named officials, to withdraw his motion for a new trial and waive his right to appeal so he would be released from solitary confinement." The coercive acts of his counsel and other state officials were alleged to have deprived Noble of his liberty without due process of law in violation of the Fourteenth Amendment to the Constitution of the United States.

Noble testified at the hearing on the motion. He testified to the following: He had been placed in solitary confinement following the riot in September, 1954, and remained there until after his trial and conviction on the charge of Donnell's murder. After the trial, he discussed his release from solitary confinement with the warden, but was told that it was a matter for the court. He had asked James to file a motion for new trial in his behalf and to appeal in the event the motion was overruled. James told Noble that he had talked to Riley and that

Riley told him that Noble would remain in solitary confinement while his case "kicked around" in the courts on appeal. Noble did not feel he could stand the mental strain of solitary confinement for such a period of time. When James told Noble that an agreement had been made with Riley for his release from solitary confinement if he waived his right of appeal, he agreed to do so.

According to Noble, the arrangement was that he should be released immediately upon the withdrawal of his motion for new trial, but immediate release did not occur. He testified that he inquired of James about the possibility of reinstating his motion for new trial and appealing. He produced a letter dated September 2, 1955 to him from James in response to his inquiry in this regard. In this letter James advised Noble that, in his opinion, an appeal at that time would be impossible. The letter stated:

"At the time of the hearing on your motion for new trial, if you will recall, this matter was discussed with you by the writer and Mr. Daly in detail, and at that time you admitted very readily that, under the law of (sic) the evidence, it would be impossible for you to obtain a judgment of acquittal, and that should you obtain a new trial, either by the circuit court or on appeal to the Supreme Court, you would, of course, face the prospects of getting a more severe sentence than the life sentence imposed upon you. Under that theory, of course, and which I believe is the correct one, it would be a useless proposition to go through the proceeding to obtain a new trial when, as a matter of fact, you might be seriously jeopardized thereby.

"Consequently, you thereupon filed your withdrawal of motion for new trial and waived your right of appeal, in writing, which was signed by you and filed in the court on the 18th day of July, 1955, * * *."

As evidence that there had been an agreement between Riley and James, Noble

pointed to the following paragraphs in this letter:

"I have discussed with Mr. Riley your situation with respect to your confinement, and he readily has admitted that there has been some delay, and some hitches, in carrying out the terms of the agreement to release you from solitary confinement, but I have just discussed the matter further with him and he has advised me that pursuant to my conversation with him of several days ago, he has made arrangements for your release from solitary confinement, and I am confident that by the time you receive this letter you will have been transferred from solitary confinement to the penitentiary proper, which is in accordance with the agreement made with Mr. Riley by the writer prior to the date of the hearing on your motion for new trial.

"If, however, you have not been transferred to the penitentiary proper, by the time you receive this letter, I will appreciate your writing me immediately and so advising me in order that I may again take the matter up with him."

Noble also produced a letter from James to him dated July 30, 1955, in which it was stated:

"I have had a further conference with Mr. Riley relative to your case, and he has agreed that he will file no further charge or charges against you, and that at the next meeting of the classification committee he will recommend to the authorities that you be released from confinement and, as DeLapp put it, 'get out with the population of the penitentiary.' "

A further letter shown in the transcript as bearing the date of September 21, 1958, which likely should have been September 21, 1955, from James to Noble contained the following:

"As I advised you at the time you withdrew your motion for new trial and waived your appeal in the case in the circuit court here, that as soon as that was done arrangements would be made for your release from solitary confinement. However,

a hitch arose in the program, and it was not until several attempts had been made to adjust the matter before you were released."

James died prior to the filing of the motion. The state did call cocounsel Daly as a witness. Daly testified that he conferred personally with Noble after the trial, once in the company of James, and alone on one or two other occasions. He stated he also corresponded with Noble. Daly testified that, after the trial, there was some uncertainty among Noble, James and himself as to whether or not a motion for a new trial should be filed. After the motion had been filed, there were discussions among them as to the wisdom of attempting to get a new trial which might result in a death sentence for Noble. Daly stated that he talked to Noble, who "at all times proclaimed his innocence," about such consideration and that eventually the withdrawal of the motion for new trial was agreed upon. As Daly stated: " * * * (T)his verdict was as good as he could expect under the circumstances, and that it was as well to waive (the appeal)." Daly stated that at none of his conferences with Noble, with or without James present, was there discussed the possibility of "trading the right to appeal for getting out of solitary confinement."

Daly stated that he was concerned about Noble's confinement in solitary and that the problem might have been discussed at the same conferences that withdrawal of the appeal was discussed. But, according to Daly, "(N)obody ever sat down and said, 'Here is the way we can get you out of solitary,' * * *." Daly stated he never discussed this possibility with any prosecuting officials.

Riley, called as a witness by the state, testified that he had no part in the manner in which Noble and his coindictees were confined following the riot. Riley stated that by prison rule an inmate who has a criminal charge pending against him ordinarily stays in "administrative segregation" until the case is disposed of. Riley stated he did not discuss the withdrawal of

Noble's motion for new trial with either James or Daly and that he participated in no arrangement to trade off Noble's right to appeal for his release from solitary confinement. Riley testified that the question of Noble's release from solitary confinement was not discussed between him and James until sometime in September, 1955, after the last of the murder trials in connection with the riot had been disposed of on September 15, 1955. Riley stated that after that time he did have some discussion with prison officials about the release of all seven of the defendants from solitary confinement.

Charles Howard, who as an assistant prosecuting attorney participated in the proceedings for the withdrawal of the motion for new trial in Riley's absence, testified that he had had no discussion with James, Daly or Riley to the effect that the motion for new trial was being withdrawn in order to obtain Noble's release from solitary confinement.

On the basis of the foregoing evidence, the trial court entered a general judgment, without findings of fact or conclusions of law, denying relief.

■ On this appeal we consider the matter de novo on the record made. State v. Brantley, Mo.Sup., 353 S.W.2d 793; State v. Richardson, Mo.Sup., 347 S.W.2d 165; Supreme Court Rule 28.05, V.A.M.R.

In its brief the state concedes that, should the facts be as alleged by Noble, he would be entitled to some relief. The state's position is that Noble failed to carry his burden to establish that the facts were as he alleged. Inasmuch as we agree with the state's conclusion in this regard, we do not decide whether or not some relief might be granted if the facts should have been found as Noble alleged nor what relief might be granted in such event.

Essentially our determination resolves itself into a matter of whether Noble testified accurately to what happened or whether Riley's version of the events is true.

Noble's version tends to be substantiated by James' letters. However, cocounsel Daly stated that he was unaware of any bargain for the waiver of appeal in return for release from solitary confinement. Daly's testimony showed that he was present at the time the withdrawal of the motion for new trial was discussed. His testimony shows further that the decision not to appeal was based upon the strategic consideration that a new trial might produce a death sentence. Certainly as cocounsel having discussed the post-trial strategy with James and Noble, Daly would have been aware of a deal had one been made. Daly's testimony shows he was aware of the confinement problem, but such problem was not the factor which prompted the decision not to appeal.

Noble points primarily to one sentence in Daly's testimony as supporting his contention. That sentence appears in the transcript as follows: "I don't think he waived his right to appeal, he traded that off just to get out of solitary." If this remark is to be construed as a declaration by Daly that Noble did trade off his right to appeal just to get out of solitary confinement, it is wholly inconsistent with all of the remainder of Daly's testimony. Prior to the appearance of this remark Daly explained at length the consideration above mentioned which led to the decision to withdraw the motion for new trial. He further testified that the probability of withdrawing the motion for new trial in exchange for a release from solitary confinement had never been discussed in his presence. Therefore, there would appear to be no basis for Daly's concluding that Noble did trade off his right to appeal just to get out of solitary confinement. Viewing Daly's testimony as a whole, we are convinced that the remark relied upon by Noble would more likely better express Daly's belief if it were punctuated as follows: "I don't think he waived his right to appeal—he traded that off—just to get out of solitary."

Noble also relies on James' letters as supporting his contention. However, the September 2nd letter clearly discusses the decision to withdraw the motion for new trial as based upon the same consideration as that expressed by Daly. The discussion of release from solitary confinement is not linked in the letter to the decision to withdraw the motion for new trial. Despite the statement in this letter concerning an agreement with Riley, we see no reason to disbelieve Riley's testimony that there was no agreement that Noble would be released from solitary confinement if the motion for new trial was withdrawn. In the September 21st letter, the statement is made that James had told Noble that, as soon as motion for new trial has been withdrawn, arrangements would be made for his release from solitary confinement. However, that statement must be considered in the light of the prison rule which had caused Noble's solitary confinement or "administrative segregation." According to Riley, that rule called for such detention so long as criminal charges were pending against the prisoner. Riley did not promulgate the rule and was not responsible for its administration. Once Noble's case had been terminated, he might have had reason to expect release from solitary confinement and James endeavored to assist him to obtain such release. Certainly the statement does not prove the existence of an arrangement among Riley, the prison authorities and James to coerce Noble into surrendering his right of appeal. The other evidence shows clearly the consideration which led to the decision to withdraw the motion for new trial and discontinue the appeal. Although the prospect of continued solitary confinement might have been a factor in Noble's mind, it was not shown to have been the basis of any bargain between his attorney and the state officials in order to defeat Noble's right of appeal.

The July 30th letter shows that Noble's release from solitary confinement was related to a decision on Riley's part to file no additional charges against Noble. Although Noble did not refer to this factor in his testimony, it is obvious that, under the prison rule, Riley's decision in this regard was important to Noble's release from solitary confinement. Undoubtedly, the events of the riot might well have given rise to a multiplicity of charges against the persons involved and Noble was understandably concerned that no further charges might be filed. However, this letter does not tend to prove the allegations upon which the relief here sought is based.

Viewing all of the evidence, we are of the opinion that Noble has failed to sustain the burden of establishing the allegations of his petition. Therefore, the trial court properly found the issues against him.

The judgment is affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM.

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.