[Crim. No. 7434. Second Dist., Div. Three. June 8, 1961.]

THE PEOPLE, Respondent, v. JOSEPH ALEXANDER EMORY, Appellant.

Dolman & Isaac and Alton I. Leib for Appellant.

Stanley Mosk, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

VALLÉE, J.—By information defendant was charged in separate counts with murder (count I) and with having unlawfully procured an abortion (count II). In a nonjury trial the court found him guilty as charged and fixed the offense in count I as murder of the second degree. Motion for new trial was denied. Defendant appeals from the judgment (order granting probation) and from the order denying a new trial.

Viola Go consulted Dr. Norman Andresen in Salinas on

August 11, 20, and 25, 1959. After a complete examination and a pregnancy test, he found she was pregnant and told her so. Dr. Andresen testified Viola was in good health at the time; he saw no reason why she should not go to full term; an abortion was not necessary to preserve her life.

Prior to September 4, 1959, Viola told her husband, George, she intended to have an abortion. Jean Dashut, George's former wife, testified that in early September 1959 Viola called her about an abortion; she (Jean) then called defendant and made an appointment to see him at 5 p.m. on September 4. On Friday, September 4, George drove Viola to Los Angeles and they went to a motel. George testified they then picked up Jean Dashut to have her take them "to a place where they could get the abortion." They went to a cocktail lounge on Osborne Avenue in the Van Nuys area of Los Angeles. George waited there. Viola and Jean went out the back way to defendant's office. Jean went in to see if it was all right for them to go in. Defendant told her to come back in 5 or 10 minutes. They waited and went in. Defendant asked Viola if she had eaten in the last six hours. She said yes. Defendant told her to go to his home the next morning at 7 a.m. "because sodium-pentathol or an anesthetic would make her sick."

The next morning Viola, George, and Jean went to defendant's home. Defendant told George to wait in the living room, "that it didn't take very long." Defendant, Viola, and Jean went into another room. Viola was placed on her back on a table with her feet in stirrups. Defendant gave her a "hypo." Jean returned to the waiting room. About half an hour later she returned to the surgery room. Defendant was standing at the foot of the table. His face was very pale, and he was very nervous. Jean saw a bucket or pan on the floor containing what appeared to be tissue and blood, the product of an abortion at about two months. She had seen a similar product previously. About half an hour later defendant went into the living room and asked George, "How far along did you say your wife was?" George said her last period was about June 15. George testified defendant said, " 'There's something real large up there. It seemed like she must be further along.' . . . that he would abort part of it, and that the other part could be after-birth or something else, but at any rate that he is not going to do no more, let her rest a while, and I understand that he gave her some ergot and let nature take its course." George glanced in the other room; Viola was on her back on a table.

George remained at defendant's home with Viola until

Monday night, September 7, leaving only to eat. He returned to Salinas, arriving Tuesday morning. There he saw a Dr. Husser and told him what had happened. Dr. Husser called Dr. William C. Bradbury, a specialist in obstetrics and gynecology in Santa Monica, said a patient who was a friend of his was in a serious condition in Dr. Bradbury's area from an abortion and asked if he would take the case. Dr. Bradbury said he would, and made arrangements for Viola's admission in Santa Monica Hospital. George returned to Los Angeles, arriving at defendant's home about 11 p.m. Tuesday, the 8th, and called an ambulance. Defendant told George to say, in case something happened, that Viola had already aborted herself and had come to him because she was hemorrhaging.

Dr. Bradbury testified Viola was admitted to Santa Monica Hospital at 1 a.m. on September 9 in critical condition. On entrance to the hospital Viola gave Dr. Bradbury's associate this history: "5 yrs ago—induced ab. Last Sat. had an induced ab. The operator knew he had perforated uterus so pt has been under med. supervision since. . . . No prior surgery other than induced abs. . . . O. B. History: L. M. P. 16 June 59." At the hospital George talked to Dr. Bradbury and told him what had happened. At Dr. Bradbury's suggestion George called defendant and asked him to call Dr. Bradbury and tell him what he had done to Viola to assist Dr. Bradbury in his diagnosis and treatment.

On September 10 defendant telephoned Dr. Bradbury. Defendant told him he had put a placental forceps into Viola's uterus and it had gone all the way up to the handle, which he thought should not happen in a patient two-months pregnant; when he pulled the forceps down it had a loop of intestine attached to it; he pushed the intestine back and put the patient to bed. Dr. Bradbury asked if he thought any injury had been done to the intestine. Defendant said, "I don't know; it might have"; he had given her some intravenous fluids and one transfusion and had transferred her to his home to take care of her.

Dr. Bradbury called in the services of Dr. David Sprong, a specialist in surgery of the bowel. Viola's case history, as taken by Dr. Sprong on September 10, 1959, was read into the record and is quoted in footnote.[1]

---

[1] "'35-year-old woman who had had an induced abortion five days ago. The uterus was perforated with a forceps and a loop of bowel pulled out. This was replaced and the patient given antibiotics and a transfusion. She has had much cramping pain and vomiting, and fever on admission here. Early yesterday morning, temperature was 102.2, leucocytes of

On September 10, 1959 Dr. Sprong, assisted by Dr. Bradbury, operated on Viola. During the operation Dr. Bradbury found: a perforation in the posterior aspect of the top of the uterus with a plastic exudate over it; a laceration of the small bowel; generalized peritonitis; "quite a bit" of food and extensive contents from the bowel in the abdominal cavity; a markedly inflated bowel; an intestinal obstruction; a marked dilatation with loops of intestine throughout the abdomen; and a tear in the mesentery with some interference with the blood supply of the bowels. Dr. Bradbury testified the perforation of the uterus and the tear in the small bowel had been made within 10 days prior to the operation; at the time of the operation Viola "was suffering from severe generalized peritonitis from contents of the bowel pouring out into the abdominal cavity." He testified further that if a woman is pregnant, it is not customary medical practice to insert instruments into the uterus; to do so is "apt to cause an abortion."

Dr. Sprong operated again on September 29 because of an abdominal abscess. Viola passed away on September 30. In Dr. Bradbury's opinion "death was caused by post-abortive infection with laceration of the bowel, generalized peritonitis, multiple abscess formation in the abdomen with a secondary hemorrhage."

An autopsy was performed. The autopsy surgeon found markings on the endocervical canal which indicated that an instrument such as a curette or one with prongs on it had passed through the cervical canal. He found a blood clot and necrotic tissue in the uterine cavity, and hemorrhage in the posterior wall of the uterus near the top. In his opinion, an abortion had been done and the cause of death was intra-abdominal hemorrhage and peritonitis due to an abortion with perforation of the uterus.

On October 1, 1959, Officer Mitchell of the Los Angeles Police Department went to defendant's home. He told de-

---

22,500 with 95 per cent polys. Her distention has increased somewhat in spite of the use of the Levine tube suction. The cramps continue, have continued for the past few hours when she has had some pain and some nausea. The abdomen is now silent and distended and tympanitic. There is some diffuse tenderness, more in the right lower quadrant.

"An X-rays shows dilated, gas-filled loops of small intestine and a little gas in the colon.

"The patient seemed pretty well hydrated by this time.

"Impression: Peritonitis. I believe there is also a mechanical obstruction, and it seems entirely possible that a loop of bowel is incarcerated in the uterus. A bowel perforation is possible, but I believe less likely.

"Advised laparotomy."

fendant Viola died the day before and he was investigating her death. In response to questions of the officer, defendant stated: He had treated Viola at his home; he had inserted inside her uterus a pair of forceps with a pointed end and serrations acting as teeth for gripping; when he removed the forceps "a loop of gut" was adhering to it; the "gut" was grasped in the pointed end of the forceps and held by the serrated ends; when he saw this "loop of gut" he was a little confused as to what it was; he examined it, determined it to be "gut," pushed it back in, and put Viola to bed at his home; when he did this, he was examining her.

Officer Mitchell asked defendant what his purpose was in examining Viola. Defendant hesitated a few moments and said, "I don't think I had better answer that." Defendant was then told he was under arrest for murder and abortion. Mitchell asked defendant to show him where the incident had taken place and said he wanted to look through the house. Defendant directed Mitchell and other officers who had appeared at that time to a building in the rear of the house. The room they entered was equipped with a gynecological table, numerous medical instruments, and medicines. Defendant was asked to produce "his patient record file, the clinical card, or any record he had made" of Viola. Defendant said he had not made any record of her visit. Asked if anyone else made records of his patients, defendant said his wife sometimes did. In the presence of defendant, Mitchell asked his wife if she had made any record of Viola's visit or what had been done to her. She said she had not; defendant said nothing.

Defendant told the officers he had called Dr. Bradbury and had told him he had inserted the instrument into Viola's uterus. Officer Mitchell asked "why he would jeopardize his license and his livelihood for the small amount of money he got for doing abortions." Defendant replied "that he did a lot of things that he knew were wrong; that they were against the law, but that he had a hard time making enough money to pay his family expenses, and so forth. . . . [T]here were many girls who came to him who had done something to themselves, and that he would go ahead and do curettements; 'clean them up.' " Mitchell testified: "We discussed that under the state law in California the only curettement that was legal was when it was necessary to save the woman's life, and he stated that many times he would clean up women who had done something to themselves, and that even thought

he knew it was not necessary to save their lives.''

Enroute to the police station Mitchell asked defendant ''how much he got for this abortion.'' Defendant said ''he had lost money on it; that in treating Mrs. Go he had used some expensive drugs, antibiotics, and so forth, and that it had cost him more than he had made.'' Mitchell told defendant he had been informed Viola had paid him between four and six hundred dollars and asked him if that was correct. Defendant said, ''I don't think I should answer that question.''

On cross-examination Mitchell testified: ''Q. Didn't he [defendant] also discuss with you the fact that when Mrs. Go got to his office she had already been in the process of aborting? A. No, sir. He made no such statement to me. Q. Did he make any statement to you about her condition when she arrived at the office when he first met her? A. No, sir, he did not.''

Defendant testified. He stated that after much persuasion by Viola and Jean, he made a pelvic examination, removed a piece of tissue which he thought looked like afterbirth and then inserted the placental forceps in the uterus ''for sounding'' to see how large the cavity was; the forceps went in to the handle; as he retracted the head of the forceps, he pulled out about an inch of viable tissue; he let go of it and it retracted immediately; he called Dr. Bradbury from a telephone a couple of doors from his office; he did not give his name; he did not ''mention anything about pregnancy'' to Dr. Bradbury; he did not tell Dr. Bradbury Viola had been aborted before he examined her.

George Go and Jean Dashut were accomplices. Defendant contends their testimony ''was not sufficiently corroborated by other evidence tending to connect defendant with the commission of the offense.'' The contention cannot be sustained.

■ ''The corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth.'' (*People* v. *MacEwing*, 45 Cal.2d 218, 224 [288 P.2d 257].)

■ The corroboration may be sufficient although slight and circumstantial and entitled to little consideration when standing by itself, and it is for the trier of fact to determine its weight. (*People* v. *Gallardo*, 41 Cal.2d 57, 62-63 [257 P.2d 29]; *People* v. *Malone*, 82 Cal.App.2d 54, 61 [185 P.2d 870]; *People* v. *McNamara*, 103 Cal.App.2d 729, 738 [230 P.2d 411]; Witkin, California Evidence, 544, § 489.) ■ It

is not necessary that an accomplice be corroborated as to every fact to which he testifies. (*People* v. *Trujillo,* 32 Cal.2d 105, 111 [194 P.2d 681].) It is the combined and cumulative effect of the evidence furnished by nonaccomplice witnesses which supplies the test. (*Id.*)　A defendant's admissions, active and passive, and his declarations constitute corroboration. (*People* v. *Malone,* 82 Cal.App.2d 54, 63-64 [185 P.2d 870].)　Inferences connecting the defendant with an abortion may be drawn from his failure to keep written records. (*People* v. *Wilson,* 25 Cal.2d 341, 347 [153 P.2d 720].)　The defendant's testimony and inferences therefrom may suffice to corroborate an accomplice. (*Id.*)

With these principles in mind, it is apparent there was abundant corroboration of the accomplices. It is not disputed that Viola was aborted. The testimony of Drs. Andresen and Bradbury, the report of Dr. Sprong, the testimony of the autopsy surgeon, the statements of defendant to the police, his failure to answer some questions, and his testimony all furnish adequate corroboration. Defendant's admissions to Dr. Bradbury and to the police that he inserted the forceps connected him with an act which could have accomplished the abortion. An unlawful intent may be inferred from the fact that defendant did not give his name to Dr. Bradbury. Furthermore, a consciousness of guilt pervades defendant's testimony. Guilty knowledge is strongly implied from his vagueness, evasiveness, and unconvincing explanations of the reasons for his actions. Defendant's testimony that ''something seemed suspicious to me,'' that ''there was just something there that gave me the feeling that I shouldn't fool with her,'' that after much persuasion he made the pelvic examination and inserted the forceps, and his failure to record Viola's case history and what he had done, are corroborative of the accomplices as to defendant's intent to procure an abortion and as to his performing the act. The corroborating evidence does more than raise a suspicion of guilt. It directly connects defendant with the commission of the offenses in such a way as to reasonably satisfy the trier of fact that the accomplices were telling the truth. In fact, if the testimony of George and Jean were wholly eliminated, there was ample evidence establishing that the offenses had been committed by defendant.

Called by defendant, his wife testified: on Monday or Tuesday morning following defendant's treatment of Viola on Saturday, she had a conversation with Viola; and ''Q. What

did Viola say? A. And Viola said that she was grateful to the doctor for having taken care of her in a messed-up situation, and that she—she talked about her children and talked about George and his vasectomy. MR. STOVITZ [District Attorney] : Just a moment, may the latter portion of that answer be stricken out as hearsay. THE COURT: It may be stricken out as hearsay. MR. LAMBROS [attorney for defendant] : It is part of the res gestae, the conversation of the alleged abortee. THE COURT: It may be stricken out. Q. BY MR. LAMBROS: What did she say when she discussed this messed-up situation? A. She said she had had something done, and when she came to the doctor she was in pain, and she was grateful that he took care of her and that he was going to take her as a patient. Q. And who else was present when this conversation took place? A. It was Monday or Tuesday morning. We talked for about an hour. MR. STOVITZ: May this entire conversation be stricken out, your Honor, as being purely hearsay. THE COURT: It may be stricken out, but I think, Mr. Stovitz, if you are going to object, you should object before the answer is in. MR. STOVITZ: I thought she was talking about a conversation that happened right after the operation. Now I find out it was Monday. I object to it on the ground it is entirely hearsay, all the conversation between this witness and Viola Go. MR. LAMBROS: . . . I say a day or two afterwards should still be reasonably construed as being the time. There would be no basis for the woman—— THE COURT: I don't agree with you. I think that part of the res gestae and part of the transaction with the defendant is admissible, although hearsay, under the exception rule. On the other hand, if it is just reciting past events, I don't think it is admissible.''

Defendant asserts the court committed prejudicial error in striking the testimony. He urges: (a) The testimony was part of the res gestae since the ''mere lapse of time between the transaction and the declaration does not make the latter inadmissible, so long as the stress of nervous excitement and emotional upset and physical shock has not subsided so that the idea of deliberate design and fabrication is negatived''; (b) aside from its admissibility as part of the res gestae, the testimony was admissible to open up a field of inquiry which would have fastened the crime on someone else.

Where the declaration forms part of a transaction which is itself the fact in dispute, or evidence of the fact, such declaration is evidence, as part of the transaction. (Code Civ. Proc., § 1850.) ■■■ Statements made at or near the

time of some exciting event under the stress of excitement produced by the event, and relating to the event are admissible in evidence. The test applicable here as laid down by Wigmore is approved in *Showalter* v. *Western Pacific R. R. Co.,* 16 Cal.2d 460 [106 P.2d 895], in which the court stated (p. 468) ''the utterance must relate to the circumstance of the occurrence preceding it.''

*People* v. *Bray,* 42 Cal.App. 465 [183 P. 712], says (p. 470) : ''To be competent as evidence, the declarations must exclude the idea of a narrative of past occurrences. Hence, declarations or complaints by one in his last illness that are but a narrative of the causes of the sickness or injury, or the manner in which or the time at which the injury was inflicted, or the nature of past symptoms, or the bodily condition at a prior time, are incompetent and inadmissible.''

The purported statements of Viola that she ''had something done,'' ''that when she came to the doctor she was in pain,'' and that she was ''in a messed-up situation'' related to an event and to her physical condition and pain prior to examination and treatment by defendant. They did not relate to his treatment nor to her physical condition at the time she is alleged to have made the declarations. They were not utterances relating to the circumstance of the occurrence preceding them. They were not declarations of present pain or of declarant's condition at the time they were made.

Defendant contends the declarations were nevertheless admissible because they tended to show that some person other than defendant performed the abortion. As defendant states, it is proper to show that some other person committed the crime with which defendant is charged. (*People* v. *Mitchell,* 100 Cal. 328, 333 [34 P. 698].) However, the question is what evidence is properly admissible to show that fact. Extrajudicial utterances offered to prove the truth of the matter stated are hearsay. Unless they are offered for some other purpose or fall within one of the exceptions allowing hearsay evidence, on objection they are properly denied admission or stricken.

Defendant, without pointing out the applicable rule other than res gestae by virtue of which he contends the evidence was admissible, relies on *People* v. *Berg,* 96 Cal.App. 430 [274 P. 433]. The theory of defense in that case, as here, was that an abortion had been performed on the alleged victim by some other person and that she went to the defendant for relief from its effects. It was held error to deny the de-

fendant physician the right to detail to the jury what the alleged victim said to him when she came to his office for treatment and also what she told him as to her condition while she was on his operating table.

Declarations made to a physician by a patient who consults him for treatment are admissible as a basis for the opinion of the physician concerning his diagnosis and treatment. These extrajudicial declarations are admitted not as proof of the facts stated but to enable the expert to explain and the trier of fact to appraise the basis of his opinion. (*People* v. *Brown*, 49 Cal.2d 577, 585-587 [320 P.2d 5], and cases there cited.) Narrative statements to a physician are to be rejected where they relate to facts not connected with diagnosis and treatment. In Brown the court stated (p. 587) it was error, although not prejudicial, not to strike the physician's testimony that the alleged victim said she "went to a residence south of the City." It was not a declaration on which he based his opinion as to her condition.

Relying on cases indicating that declarations of the victim in an abortion case to third persons *prior* to her visit to the defendant were admissible to show the purpose of her visit was to procure an abortion, the court in Berg stated (96 Cal.App. at pp. 441-442) :

"It should be strange indeed if the defendant could not prove, in such a case, either by his own testimony or that of others who were present, that the alleged victim declared she came to him for a totally different purpose, for instance, to be treated for a condition resulting from an operation for abortion already performed by some other person."

It thus appears that the holding was based on the rule which admits extrajudicial declarations of *present* intention, plan or design offered as circumstantial evidence that the intention, plan or design was carried out. (See *People* v. *Alcalde*, 24 Cal.2d 177, 185-186 [148 P.2d 627].)

The facts of Berg were quite different from those in the present case. There the declarations were made *to a physician prior to and during* the course of his examination. Here the declarations were made *to a third person two to three days after* the examination and treatment by defendant. Berg is not in point. We conclude the alleged declarations were properly excluded under the hearsay rule.

 Defendant contends the striking of the testimony closed the field of inquiry as to other statements which Viola may have made to the witness at the same time and which

might have brought out the facts as to what had happened to her. No offer of proof was made of other evidence to which the witness could testify and which might have been admissible on some ground. Claim of prejudice, even had error been shown, appears devoid of merit in view of the fact that at another point the witness was permitted to testify that prior to treatment by defendant Viola "said something about having something done in Salinas but she didn't elaborate. . . . She said she had been pregnant and had lost the baby. That was at the time before he checked her, and that she was having crampy pains and wanted to see why. She thought she had been pregnant and lost it and was having crampy pains." And a maid who worked for defendant testified Viola said to her on the morning she was examined by defendant that she had had a miscarriage before she came to him and the reason she came was because she had a lot of pain.

▆▆▆▆ Defendant asserts the judgment of the court was based on its conjecture as to what a prosecution witness might have testified to and not on any inference from the testimony actually received. The assertion is predicated on statements of the trial judge made in summing up the evidence.

▆▆▆▆ "No antecedent expression of the court, whether casual or cast in the form of an opinion, can in any way restrict its absolute power to declare its final conclusion upon proper submission of the cause; nor will such an expression, casual or otherwise, furnish any basis for attack on a finding unless it be 'made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below' (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778])." (*People* v. *Smith,* 176 Cal.App.2d 688, 692 [1 Cal.Rptr. 661] ; *People* v. *Alexander,* 78 Cal.App.2d 954, 957 [178 P.2d 813].) ▆▆▆▆ In the present case it is not made to appear that on no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.

▆▆▆▆ It is contended the judgments as to both count I (murder) and as to count II (abortion) cannot stand. The point is well taken. To permit the convictions under both counts to stand would violate the provisions of section 654 of the Penal Code that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a

prosecution for the same act or omission under any other.'' It is patent from the evidence that defendant committed against Viola only one criminal act, that is, the insertion of the instrument. That act, because it was ''with intent thereby to procure the miscarriage of such woman'' and was not ''necessary to preserve her life,'' violated section 274 of the Penal Code. The same act, because it resulted in ''the unlawful killing of a human being, with malice aforethought'' (Pen. Code, § 187), violated section 189 of the Penal Code against murder of the second degree. Section 654 applies where a defendant by one act commits more than one offense. (*People* v. *Brown*, 49 Cal.2d 577, 590-593 [320 P.2d 5].)

To preclude dual judgments standing against defendant, the judgment of conviction of the less severely punishable offense should be reversed.

The judgment and order denying a new trial as to count II are reversed, and the judgment and order denying a new trial as to count I are affirmed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied July 5, 1961, and appellant's petition for a hearing by the Supreme Court was denied August 2, 1961.