**STATE of Missouri, Respondent,**

v.

**Dr. Richard P. MUCIE, Appellant.**

No. 54317.

Supreme Court of Missouri,
Division No. 1.

Jan. 12, 1970.

John C. Danforth, Atty. Gen., Dale L. Rollings, Asst. Atty. Gen., Jefferson City, for respondent.

Lawrence F. Gepford, R. Bruce Sears, Kansas City, for defendant-appellant.

HIGGINS, Commissioner.

Dr. Richard P. Mucie, a licensed osteopathic physician and surgeon, was convicted by a jury of manslaughter by abortion; his punishment was assessed at 10-years' imprisonment in custody of the Department of Corrections, and sentence and judgment were rendered accordingly. Section 559.-100, V.A.M.S.

The victim of the crime charged against Dr. Mucie was a 19-year-old student at Oklahoma University. Around Thanksgiving vacation in 1967, she advised her boy friend that she might be pregnant and they decided to seek an abortion because she did not wish to have the baby. She enlisted the help of her boy friend who, in turn, discussed the matter with his father in January, 1968, at Norman, Oklahoma. The father was advised of the pregnancy; that the girl, although engaged to the boy, did not wish to marry at that time, and that the girl did not want to have the baby.

On January 30, 1968, the boy's father called Dr. Mucie in Kansas City, Missouri, and told him that his son and his fiancee had a problem in connection with her pregnancy. Dr. Mucie advised the boy's father to have the girl examined by a doctor to determine the length of the pregnancy. The father learned from his son that the onset of pregnancy was the first or middle of October, 1967, and, upon relaying this information to Dr. Mucie, was told by Dr. Mucie that "it was too late to do anything about it." This advice was relayed by the father to his son and the father was then told that the girl had not been examined. The father again told his son to have the girl examined and, subsequently, the son called his father and advised that his fiancee was then 13 to 14 weeks pregnant. This information was relayed to Dr. Mucie, who advised the son's father to have the girl come to Kansas City on the evening of February 7, 1968. The father understood that the cost would be "about four."

The father told his son of the advice received from Dr. Mucie and, on February 7, 1968, the son and his fiancee flew to Kansas City, arriving at 6:30 p. m. They went by taxi to 1924 East 31st, Kansas City, Jackson County, Missouri, where they met Dr. Mucie in his Kansas City Sinus Clinic. They waited in the lobby for ten or fifteen minutes before the girl went into the inner office. After about fifteen more minutes the girl came out with Dr. Mucie. "He said he couldn't do anything at the time, but he would take us, he had made arrangements for us to have a room at the Ambassador Hotel, and that he would take us there, and then call us about 11:30 and come pick us back up." During the interim the couple ate and attended a show.

At 11 p. m., Dr. Mucie called, and about forty minutes later arrived at the hotel to take the couple back to the Sinus Clinic. Dr. Mucie took the girl to the inner office and the boy waited in the outer office. In 20 to 30 minutes Dr. Mucie came to the outer office dressed in a surgeon's gown and asked the boy if he would like to pay him before he started, and the boy paid Dr. Mucie $400 in one hundred dollar bills. That was the last the boy saw of Dr. Mucie for several hours except when he came to the outer office every half hour or so to change music records.

At about 7:30 a. m., February 8, 1968, Dr. Mucie asked the boy if he wished to see the girl. He went to the inner office and saw his fiancee lying on a couch with a cover over her. Dr. Mucie said she was under sedation. He said "hello" and, al-

though she did not speak, she smiled and seemed to move her hand. Dr. Mucie gave him some tomato juice and he went back to the outer office and slept until around 11:30 a. m.

About 11:30 a. m., he was awakened by Dr. Mucie's porter and a little later Dr. Mucie came in and "said that she had had a heart attack, and that she was in a state of shock, and they had taken her to the hospital * * * he was going to the hospital, and he would be right back to take me there * * * and about another half hour passed, and I didn't see him again, so I went to look for him. * * * I heard Dr. Mucie's voice in a far back room * * * he was laying on his bed talking on the telephone to someone. * * * He said something to the effect that it was necessary for a coroner to be called in, couldn't he just file (fill) out a doctor's certificate of death. * * * Then I went back into the office and sat down and he came in about another five or ten minutes later and told me she had died, * * * and then he said that the only possible way we could get out of this is if I said that— went along with him and said that we had been passing through Kansas City and that she had had chest pains, and that I had brought her to him for treatment * * *."

On February 8, 1968, at about 11:30 a. m., Charles William Sievers, an ambulance driver went with his attendant to the Sinus Clinic and found the girl lying on a doctor's cot. Dr. Mucie advised that he detected a heartbeat and instructed them to take the girl to Osteopathic Hospital and give her oxygen enroute. They were not advised what treatment the girl had been given; they noted blood on the girl's fingers, stiffness of the arms, and the hand was in a "clawed" position. Dr. Mucie wiped some blood from between the fingers of the clawed hand. Upon lifting the patient, the attendant noted that the girl's legs did not bend down, and when in the ambulance he was unable to detect a pulse or heartbeat.

When the ambulance arrived at Osteopathic Hospital at 1:00 p. m., Dr. Richard Frederick Spavins, an osteopathic physician and surgeon, examined the girl. He found no pulse and concluded she had been dead about four hours. Dr. Spavins called Dr. Mucie and was advised by him that he had given the girl cardiac resuscitation and an injection of Vistaril, a tranquilizer, and that he had been treating her for two weeks for a heart condition. When advised by Dr. Spavins that he was going to call the coroner, Dr. Mucie told him he could and would sign the death certificate. There was no mention of abortion, uterine hemorrhage or of any treatment other than the cardiac treatment in the conversation.

The body was taken by the same ambulance to the morgue at General Hospital.

Detective James W. Smith observed the girl's body at the Osteopathic Hospital at about 1:40 p. m., February 8, 1968, and noted needle marks on her arms, buttocks, and left breast. He later took photographs of the body showing the needle marks. He was present at the autopsy performed on the body at General Hospital by Dr. Raymond J. Caffrey, a pathologist and deputy coroner, and took custody of part of a fetus removed from the girl's uterus and the uterus from the girl's body, both of which were put into preservative bottles.

Detectives Kenneth Riddell and Floyd Foster went to the Sinus Clinic at 6:30 or 7:00 p. m., February 8, 1968, and, upon examining a trash container, "a dumpster," on the premises, found numerous items and what appeared to be part of a fetus.

Dr. Andrew McCanse, medical doctor and coroner of Jackson County, viewed the body at General Hospital about 2:30 p. m., February 8, 1968, and appointed his deputy, Dr. Caffrey, to perform an autopsy. Dr. McCanse called Dr. Mucie and was told by him that he had seen the girl the previous evening with complaints of chest pain and nervousness, and he thought she might have some cardiac condition which he treated with Vistaril by injection. He said

later that evening she reported she was feeling all right again, and then early the following morning she came to his office complaining again of chest pain. He said he gave her some more Vistaril and that she went to sleep. Later he checked the girl and was unable to arouse her. He said he gave her Coramine and thought he could detect a faint heartbeat. He said he also gave oxygen, adrenalin, and cardiac resuscitation by massage and mouth-to-mouth breathing. About noon he sent her to Osteopathic Hospital. He said he thought she had a cardiac condition that was complicated by shock which was the apparent cause of her death. "I asked him whether she had said she was pregnant or whether there was any suspicion by him she was pregnant, and he told me that she had not said so, that he had not asked her, and that he had not examined her for pregnancy."

Dr. Caffrey, in performing the autopsy, noted needle punctures on the girl's arms, buttocks, and over the third rib interspace on the left side. He saw blood smudges on her fingertips and left heel. A pink staining material resembling Merthiolate was present on the perineum space between the legs. He also noted that the breasts were unusually tense and the nipples were heavily pigmented, indicative of pregnancy. The uterus was found to be substantially enlarged and softened, and had the general characteristics of a pregnant uterus. The cervix was markedly dilated or opened and did not have the consistency of a non-pregnant cervix. He could feel a hole in the middle of the cervix consistent with a recently evacuated uterus. There was a defect in the uterus, a rent, surrounded by a moderate amount of hemorrhage. The rent was half an inch in length, one-half inch in thickness, one thirty-second inch maximum width. The abdominal cavity contained 1200 cc's (in excess of a quart) of fluid and clotted blood, and there were two or three ounces of blood inside the uterus. The only source of bleeding was the hole in the uterus. The skull and the upper half of the spinal column of a fetus were found in and removed from the uterus. Dr. Caffrey also examined the fetal parts found in the dumpster at the clinic which he identified as a scapula or shoulder blade, upper part of the arm including shoulder joint, and a part of a collarbone. He was unable to fit the parts taken from the dumpster to the fetus taken from the body but they were the same parts as those missing from the fetus taken from the body and were consistent in size. Dr. Caffrey concluded that the girl's uterus had been pregnant and had been evacuated in a most unusual fashion. It was empty except for the large fetal part. There was substantial hemorrhage beneath the lining of the heart in the wall of the left ventricle indicative of the type change commonly seen in the heart of one who is dying over a period of several minutes, usually hours, from lack of oxygen, and is a fairly common accompaniment of persons who die slowly and in shock. The condition was consistent with the findings of bleeding through the uterus. An abortion after four or four-and-a-half months by dilation and curettement is dangerous because the uterus becomes very soft and the hazards of perforating the uterus with the scraping tool go up alarmingly. If it is necessary to evacuate a uterus after that time, the most generally used procedure is to open the abdomen much in the manner of a Caesarean section. Dr. Caffrey believed the girl "died from shock due to hemorrhage, due to a perforation of her uterus which was pregnant at the time it was perforated." The perforation would have to have been done by something inserted into the girl's uterus. He felt the fetus by size was consistent with a fetus of four-and-a-half to five month's gestation. Dr. Caffrey was cross-examined on a line tending to show consistency between the dead girl's condition and self-induced abortion, but he felt it "highly unlikely" that even "if we are dealing with a frantic nineteen-year-old suicidal girl, that such a person could take an object and tear a fetus."

Dr. Mucie took the stand to state his own version of the case. He received a call around February 2, 3, or 4, 1968, from a man who stated he had a son in Oklahoma who had his girl friend pregnant. "He wanted to know if I knew of anyone here in Kansas City who may help her." Upon being told that the girl's last menstrual period was around the first of October, Dr. Mucie advised the man it was too late and dangerous to try to terminate a pregnancy after that time. A second call from the man a few days later advised Dr. Mucie that they had made a mistake, that the last menstrual period was the first of December. Dr. Mucie told the man that was "quite a big mistake" and to have the girl examined. A third call from the man advised they could not find a doctor to examine the girl and the man asked if he could bring the girl to Kansas City for the examination. He asked the cost of the examination and Dr. Mucie said, "About $4." The young couple came to his office on Wednesday, the day before the office closed for a day. They arrived at his office about 6:30 p. m., February 7, 1968, and he examined her to determine pregnancy and duration of pregnancy. He found the pregnancy to be of four-and-a-half or five-and-a-half months' duration and told the girl nobody could help her terminate the pregnancy. She became nervous and said it would kill her father. She said she would kill herself and Dr. Mucie gave her Vistaril to quiet her. At their request he drove the couple to the Ambassador Hotel. He then went to the lumberyard to get some hinges and knobs which he wanted to install at his clinic. He went to his office, did some work, and went to bed about midnight. After he went to bed he received a call from the girl informing him that she was feeling bad all over. "She was crying and nervous and hysterical." He told her to come to the office and she and the boy arrived there at 1:00 or 1:30 a. m., February 8, 1968. "She said, 'I had to do it, I just had to do it.' * * * So I placed her in a gown and routinely gave her a bimanual vaginal examination, and there I determined duration of the

products of conception was beginning to protrude from the cervix itself." He then examined her with a vaginal speculum and "I noted there was a protrusion of tissue, placenta tissue and fetal parts. * * * She was in a state of aborting, and at this time immediate medical attention had to be instituted. * * * I taken her off this table and I carried her into this other room onto my surgical table, and here I placed her in stirrups and such things as that. * * * Naturally I went ahead and I sterilized the area, I washed the area with antiseptic soap and then I went in and painted that with Metaphen in order not to get any infection, and I took forceps and pulled out this bulging mass that was there." He gave Pituitrin to contract her uterus "and I noticed that the uterine wall was not clean. So the next proper step is to get a curettement, which I did, a dull curettement. * * * The reason why I done that is because the uterus was still boggy. It was not contracting as it should, and I noticed the bleeding that was occurring." He gave her penicillin by injection, Tetracyn, and Ergotrate to stop bleeding. He put her to bed around 5:00 or 6:00 a. m. and took a blood count, urinalysis, and blood pressure, all of which were normal. He rested for awhile and, about 7:00 a. m., found her hard to arouse after which he gave medications and initiated emergency and resuscitory procedures. He called an ambulance, told the boy his girl friend must have had a heart attack, and sent the girl to Osteopathic Hospital. He told the drivers he thought she had a faint heartbeat and called the hospital. He admitted the conversation with Dr. McCanse and that "most everything he said was more or less the truth. * * * The reason why I told him that is because (the boy) told me if there is anything we could do so it wouldn't be known she was pregnant. I said, 'Well, I will try.' So Dr. McCanse asked me if I thought there was any pregnancy there. I told him I didn't think so, and we didn't mention pregnancy, just there was no use trying to do something because there was no life there, and if I can spare humiliation of

someone including her father who the way she expressed it was an individual who was not in good health and the slightest shock would have caused something greater." Dr. Mucie made no records of his treatment of the girl. He stated he did not perforate the uterus but went "in to clean up the uterus," not knowing it had been perforated. Prior to sending the girl to the hospital he redressed her to avoid its being known she was pregnant.

Dr. Richard Wasserman, a doctor of osteopathy, specializing in obstetrics and gynecology, was called by defendant. He testified in answer to questions relating to self-abortion and abortion, either induced or spontaneous, where the abortion is incomplete. He stated that in an incomplete abortion with part of the fetus outside the cervix proper procedure would be to attempt to complete evacuation of the uterus and take preventive measures against shock and control bleeding. He felt that a curettement might puncture a uterus because it is soft and cannot be seen. He knew of no curette small enough to make a one thirty-second inch width tear in a uterus. He found nothing in the coroner's report to indicate marks on the dead girl's cervix to show insertion of a curette.

Dr. Lawrence S. Merritt, a specialist in obstetrics and gynecology in Norman, Oklahoma, testified in rebuttal that he saw the girl February 5, 1968, did a pelvic examination, and determined her to be in her twenty-first week of pregnancy, consistent with a last menstrual period around September 16, 1967.

The girl's father identified a letter from his daughter postmarked February 2, 1968, in which she stated her happiness, her engagement, described the nice person her fiance was, and her carefree college life.

Katy Monfort, the girl's roommate, saw the girl February 7, 1968, and she did not seem upset. She talked by long distance telephone with the girl that night and she heard the boy laughing in the background. The call was made by the girl to ask Katy to hand in her homework the next day and to tell her plan to be home the next day.

Section 559.100, V.A.M.S., provides in part: "Any person who, with intent to produce or promote a miscarriage or abortion * * *, uses * * * any instrument or other method or device to produce a miscarriage or abortion (unless the same is necessary to preserve her life or that of an unborn child, or if such person is not a duly licensed physician, unless the said act has been advised by a duly licensed physician to be necessary for such a purpose), shall, in event of the death of said woman * * * upon conviction be adjudged guilty of manslaughter, and punished accordingly." Under the statute, as it applies to appellant, a duly licensed physician, the offense is made out and the conviction sustained when it is shown that he used an instrument or device to cause his victim to abort when such was not necessary to preserve her life, and the procedure caused her death. The statement demonstrates evidence from which the jury could find, as it did, that Dr. Mucie, with intent to produce a felonious abortion upon his victim, used an instrument upon her for the purpose of terminating an unwanted pregnancy for her as opposed to performing such an operation as a necessary measure to preserve her life, and from which acts she died. See State v. Werbin, Mo., 345 S.W.2d 103, 107–110[4–5].

Appellant tacitly concedes the sufficiency of evidence to sustain conviction, but contends that, even so, he should have a reversal and discharge because the statutory provision "necessary to preserve her life" is "unconstitutional and is in violation of the due process clause of the Constitution of the United States and the Constitution of the State of Missouri for the reason that it is unreasonable, discriminatory, vague and indefinite and in violation of the right of privacy." See People v. Belous, Calif., 80 Cal.Rptr. 354, 458 P.2d 194, and United States v. Vuitch, 305 F.Supp. 1032, U.S. D.C., D.C., November 10, 1969.

The posture of appellant's case does not present nor involve issues entitling him to a determination of his alleged constitutional question. The applicable general rule is that the constitutionality of a statute is considered in the light of the party seeking to raise the question and of the particular application of the statute to him, and a constitutional attack may not be made by one whose rights are not, or are not about to be, adversely affected by operation of the statute, and one may not urge unconstitutionality of a statute who is not harmfully affected by the particular feature of the statute alleged to be unconstitutional. 16 C.J.S. Constitutional Law § 76, pp. 226–231; State ex rel. State Board of Mediation v. Pigg, 362 Mo. 798, 244 S.W.2d 75, 79 [5, 6]; State v. Baskowitz, 250 Mo. 82, 156 S.W. 945, 949–950[2]; State v. Bockstruck, 136 Mo. 335, 38 S.W. 317, 323. The case against Dr. Mucie was made upon affirmative showing that the victim desired and sought an abortion to rid herself of an unwanted child and that Dr. Mucie performed the abortion for that purpose. Defendant's own testimony was to the effect that the girl came to him in an already, or incompletely, aborted state, and that his actions were not those designed to produce abortion but were to "clean up" after an already, or partially, accomplished abortion. His testimony did not go to a defense based on the exception to the statute "unless the same is necessary to preserve her life," but went, rather, to a defense (unbelieved by the jury) that he did not do it; someone else did it, and he simply tried to save her from the consequences of a botched job. Attempted support for such defense is demonstrated by the type questions put to the state's pathologist, Dr. Caffrey, upon his cross-examination, and to defendant's expert, Dr. Wasserman. The record shows further proof of the theory of defense when, in the course of colloquy between court and counsel concerning the scope of cross-examination of the state's principal witness, defense counsel represented to the court and stated, "We intend to prove that this abortion was a matter of self-induce-

ment and this is the key crucial issue in this lawsuit. * * * We are contending this couple was so desperate after having been turned away it was self-induced. * * * Our position will be that it was self-induced." Finally, defendant's case was not submitted on any theory of acting in necessity to save life, but was submitted by Instruction No. 5, which directed that defendant could not be convicted if the jury found that when the girl went to defendant's office in the early morning of February 8, 1968, her pregnancy had already been interrupted and that defendant had not performed an act prior to that time, and by Instruction No. 6 which directed that if the jury found that defendant did not make the assault requisite to the state's case, and after an incomplete abortion the defendant did a curettement, even though negligently done, such would not constitute a criminal offense and could not be considered in arriving at a verdict.

Thus it is demonstrated that defendant did not seek to avail himself of any rights under, or bring himself within, the exception which he alleges to contain elusive or vague language; he was not harmfully affected by that feature of the statute, and the question he would pose is thus not an issue on this appeal. See Kudish v. Board of Registration, Mass., 248 N.E.2d 264, 266[2, 3].

Appellant contends he should have received a new trial "because of the prejudicial cumulative effect of the following errors:

"(a) In allowing the admission into evidence of

"(1) The actual uterus of the deceased

"(2) The fetal parts taken from the body of the deceased

"(3) Eight photographs of the deceased's body

"(4) The fetal parts taken from the trash can at the alleged place of the abortion

"(5) A hearsay letter from the deceased to her father.

"(b) In allowing the father of the deceased to testify * * * although the rule prohibiting witnesses from being in the courtroom was in effect and he had been present during the trial.

"(c) In allowing Katy Monfort, Bert Ward and Dr. Lawrence Merritt to testify as rebuttal witnesses when all of the matters they testified to were properly part of the State's case in chief.

"(d) In allowing the State to demand the records of the defendant in violation of his right against self-incrimination."

Appellant concedes that each of the mentioned errors "may not have been such prejudicial error to constitute a reversal, all of the errors taken as a whole * * * amounted to such prejudicial error that the defendant's right to a fair trial was violated."

■ Of more damage than this concession with respect to the charge of cumulative error is the failure of appellant to raise and preserve an issue of cumulative error in his motion for new trial. The same defect exists as to the error charged in connection with the admission of photographs. Since such charges were not presented to the trial court in the motion for new trial, they are not preserved for appellate review. State v. McCrady, Mo., 416 S.W.2d 175, 177[4]; State v. Nolan, Mo., 423 S.W.2d 815, 817–818[4].

Appellant argues that the admission in evidence of the uterus and fetal parts served no useful purpose since the cause of death was not denied or disputed, and that their admission served only to inflame the jury.

■ It is error to admit evidence of an inflammatory nature if it does not reasonably tend to prove or disprove a disputed fact issue, State v. Pearson, Mo., 270 S.W. 347, 351. However, other evidence will not prohibit use of demonstrative evidence which has probative value in establishing conditions and corroboration of witnesses on the issues of the case, State v. Tyson, 363 Mo. 1242, 258 S.W.2d 651, 654[3, 4].

■ All of these organs were preserved in clear glass bottles in the manner of laboratory specimens. They had probative value on size and location of the rent or perforation and there was dispute whether a curette could make such a small tear; they demonstrated pregnancy and duration of pregnancy which went to corroborate the girl's wish; they showed the softened condition of the uterus which made it more susceptible to damage by a curettement; they showed cause of death; they showed use of an instrument and force upon the uterus and fetus, and connection between actions at the clinic and ultimate findings. For rule permitting introduction of organs of a deceased, see 22A C.J.S. Criminal Law § 716, p. 991, and, in particular, for admission of a uterus, see People v. Coltrin, 5 Cal.2d 649, 55 P.2d 1161.

■ The letter in question was admitted in evidence upon rebuttal to show the victim's state of mind after defendant had adduced evidence tending to depict the victim as a nervous, hysterical, and suicidal girl who, after being refused an abortion, self-induced an abortion which produced a condition that defendant only treated. The letter depicted the girl as a happy and stable person, thus showing her mental condition at the time of contacts in her behalf with Dr. Mucie, and thus rebutting the image attempted by defendant. The propriety of admitting a letter showing the state of mind of one whose state of mind has been put in issue was recognized as early as State v. Kring, 64 Mo. 591 (ultimately reversed 107 U.S. 221 on other grounds). See also State v. Porter, 213 Mo. 43, 111 S.W. 529; Banovitch v. Commonwealth, 196 Va. 210, 83 S.E.2d 369, 375[18]; 22A C.J.S. Criminal Law § 742, pp. 1103–1104; 1 Wigmore on Evidence, 3d Ed., Sec. 144, p. 581. The proposition is accurately stated in State v. Prytle, 191

N.C. 698, 132 S.E. 785, 786[3]: "These declarations, it should be remembered, were offered, not as proof of the truth contained in such declarations, but as evidence of the fact that they were made, thus exhibiting a condition of mind, which may be shown by sounds or words, spoken or written, or by emotions displayed, or acts done. Wigmore on Evidence (2d Ed.) §§ 143 and 1725.

"The condition of the mind is just as susceptible of proof as the condition of the stomach, but each can be shown to others only by some external manifestation, such as an expression on the face, or a gesture or appearance of the body, or some act or speech; and proof of any or all of these for the sole purpose of showing the state of mind or intention of the person is proof of a fact or facts from which the state of mind or intention may be inferred. The admission of such evidence is not violative of the rule against hearsay."

Appellant's citations are to be distinguished in that in State v. Benson, 346 Mo. 497, 142 S.W.2d 52, the questioned evidence was not a declaration on state of mind; in State v. Cochran, 356 Mo. 778, 203 S.W.2d 707, the letter writer's state of mind was not in question; and in State v. Gorden, 356 Mo. 1010, 204 S.W.2d 713, a hearsay statement was properly refused because it was offered as proof of its contents, the corpus delicti in an incest case.

■ Similar circumstances surround the victim's father as a rebuttal witness. In that capacity, he identified the letter from his daughter which was held properly admitted in discussion of the previous contention. Since the letter itself was properly admitted, it cannot be said that the court abused its discretion in permitting this witness to identify the letter, even though he sat through the trial, because his testimony was not a matter for the state's case in chief and was properly a matter of rebuttal. See State v. Lord, Mo., 286 S.W.2d 737, 741[13]; State v. Daegele, Mo., 302 S.W.2d 20, 24[8, 9];

State v. King, 342 Mo. 975, 119 S.W.2d 277, 285[16, 17].

■■ The attack on the rebuttal testimony of Katy Monfort is governed by the same rule which permitted the victim's letter in evidence because her testimony likewise went to the victim's mental condition which was put in issue by the defense. The testimony of Dr. Merritt was offered and received in rebuttal of defendant's assertions of the victim's failure to have an examination to determine her pregnancy and duration of pregnancy prior to final contact with him concerning the abortion. As such, his testimony was properly rebuttal and was not a part of the state's case in chief on the state of the victim's health.

■ The record does not support appellant's charge that the state was permitted to demand his medical records in violation of his right against self-incrimination.

Upon cross-examination, Dr. Mucie was asked:

"Q Do you have your records on this patient, sir? A No, I don't. Q Did you make records? A The condition she was in I had no time to make records. Q Did you make records later? A No, I didn't. * * *

"Q Do you normally make records of someone? A Yes, I do. Q Didn't you think that would be important that your medical records be intact as to what had been occurring at your office that evening? * * * A When I do my laboratory work right alongside of a microscope I have my pad and I jot down what I find and that is what I did.

"Q But even though you knew the coroner would be called in, you made no medical record? * * * A If the coroner wanted the lab reports I would have given them to him.

"Q My point is this, sir, even though you told the boy that the coroner would

probably be called in you made no medical record? * * * A I just got through telling you that I did write that down. Q Where is that record? * * *

"MR. QUINN: * * * I object to the last question as a direct attempt to invade the constitutional privilege of this man against self-incrimination. * * * This was a demand for evidence * * * (and) because of the inference attempting to be made by the Prosecuting Attorney that there was some requirement on this man to produce some kind of evidence * * *."

This portion of the transcript has been quoted because it demonstrates that there was no demand made for defendant to produce any of his records. The questions and answers adduce only a failure to make certain records normally made and kept by a doctor of medicine; and, with respect to the laboratory notes, the objection interrupted any demand to produce that might have followed the question, "Where is that record?" Consequently, the posture of this issue is not that of a constitutional right against self-incrimination. It is, however, similar to that in People v. Emory, 192 Cal.App.2d 814, 13 Cal.Rptr. 889, 894 [5], where failure of a physician to keep medical records contrary to normal procedure was held to raise an inference of connection with the abortion charged against him. See also People v. Wilson, 25 Cal.2d 341, 153 P.2d 720, 724[10].

■ Appellant contends the verdict was excessive and reflected such passion and prejudice that it was an abuse of discretion for the trial court to decline a reduction of punishment under Section 546.430, V.A. M.S., and Criminal Rule 27.04, V.A.M.R., which provide that a trial court may reduce a jury's assessment of punishment if it is greater than it ought to be under the circumstances of the case. He concedes that in order for the supreme court to order a reduction the necessary passion and prejudice and abuse of discretion must appear clearly in the record. State v. Caffey, Mo.,

365 S.W.2d 607; State v. Laster, 365 Mo. 1076, 293 S.W.2d 300.

■ Several factors bear upon a request for reduction of punishment, but their consideration within the posture of this case does not warrant a reduction.

■ One such consideration is whether the penalty was the maximum provided by law. State v. McHarness, Mo., 255 S.W.2d 826, 829[4, 5], but punishment will not be deemed excessive or the result of passion and prejudice simply because it is the maximum fixed by statute, State v. Laster, supra, 365 Mo. 1076, 293 S.W.2d l. c. 305[3].

A second consideration is whether the crime was a brutal one, State v. Sheard, Mo., 276 S.W.2d 191, and this is of no help to appellant because it was demonstrated that the victim died over a period of several hours by bleeding to death as a result of defendant's actions.

Another consideration is the time in which the jury reached its verdict. This jury reached its verdict after a lapse of an hour and fifteen minutes, forty minutes slower than did the jury in State v. Caffey, supra, where the court refused a reduction urged on this ground.

■ Another consideration stemming from State v. Caffey, supra, is whether any specific instances of improper prejudicial actions of witnesses, court, or prosecution occurred. Appellant argues this point with reference to the allegedly inflammatory incidents of trial and exhibits in evidence; but since it has been demonstrated that they were not matters of error, they do not serve to support relief on this ground. Appellant also refers to the court's admonition to counsel to relax and calm down, but this could not be an instance of prejudice bearing on the jury verdict because the record shows it occurred in chambers during defense counsel's argument on defendant's right to cross-examine a state's

witness in support of the defense theory of self-abortion.

Finally, appellant seeks reduction by citation of a number of manslaughter cases in which lesser punishments than that assessed Dr. Mucie were involved. These are not persuasive on the issue of reduction in that in none of those cases did the trial or appellate court reduce a sentence on a manslaughter conviction under Section 559.100, supra.

Finally, appellant contends the court erred in not granting a new trial because of newly discovered evidence.

Appellant's motion for new trial was due on or before August 6, 1968. It was timely filed August 5, 1968, but contained no reference to, or allegation of, newly discovered evidence. Not until October 31, 1968, when appellant filed an "amended" motion for new trial was there any reference to newly discovered evidence. Consequently, the matter is not for review because it was not presented to the trial court by timely motion for new trial in that the amended motion was a nullity. See State v. Ash, Mo., 286 S.W.2d 808, 812[9]; State v. Townzell, Mo., 286 S.W.2d 785, 787[4]; State v. Miller, Mo., 368 S.W.2d 353, 360[12, 13]; and, with respect in particular to presenting alleged new evidence, see State v. Clark, Mo., 277 S.W.2d 593, 600[7]. This ruling cannot be an undue restriction on this appellant. The record shows that he knew of the alleged new evidence in July, 1968, prior to filing his motion for new trial August 5, 1968, and made no move to present the ground to the trial court until after his time in which to file motion for new trial had expired. He thus did not exercise the diligence required of him with respect to newly discovered evidence. State v. Harris, Mo., 413 S.W.2d 244, 247[3, 4].

Judgment affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

SEILER, P. J., HOLMAN, J., and HENSON, Special Judge, concur.

STORCKMAN, J., not sitting.